No. 58,240

DEBORAH K. FUDGE, *et al., Appellees,* v. CITY OF KANSAS CITY, KANSAS, *et al., Appellants.*

(720 P.2d 1093)

Opinion filed June 13, 1986.

*Daniel B. Denk,* of Kansas City, argued the cause, and *Robert J. Watson,* city attorney, and *Jody Boeding,* assistant city attorney, were with him on the brief for appellants.

*Bryson R. Cloon,* of Cloon & Bennett, of Overland Park, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is a wrongful death and survival action arising out of an automobile accident. The City of Kansas City and Kansas City police officers appeal from a jury verdict finding them 18% at fault for the accident.

The facts are that on the night of July 29, 1981, and in the early morning hours of July 30, 1981, Delmar Henley was drinking with friends at the Sixteenth Round bar located at 2847 Roe Lane, Kansas City, celebrating his sister-in-law's birthday. Henley was very drunk, having consumed, by his own estimate, 29 to 30 beers and 10 "kamikazees". He stumbled around, knocked over chairs and was belligerent, loud and obnoxious. Janice Heckman, the bartender, asked Henley to leave. Henley refused and Ms. Heckman called the Kansas City police. Before the police arrived, all of the bar patrons, including Delmar Henley, left the bar and migrated to the adjoining parking lot.

According to witnesses, two police officers arrived at the scene while Henley was in the parking lot. The officers got out of their cars, approached to within four or five feet of Henley and observed his intoxicated condition. The policemen, Officers Conchola and Gorham, instructed those patrons remaining in the parking lot to leave the scene. Everyone complied, leaving on foot, except Henley, who left in his car. These same witnesses testified the officers told Henley to get in his car and leave. Henley corroborated this testimony. The policemen denied these statements, testifying instead that they did not see Henley and that there was no disturbance in the parking lot while they were there. Testimony of two other officers who arrived at the parking lot after it had been vacated corroborated the testimony of Conchola and Gorham.

Janice Heckman testified that when Delmar Henley drove out of the parking lot he veered his car into the southbound lane of Roe Lane, heading north. His action nearly resulted in a collision with a southbound Kansas City police car, which stopped to avoid an accident. Henley then swerved into the proper traffic lane and proceeded north, as the policeman continued south on Roe Lane.

Simultaneously with these events, James E. Fudge left his home with his son, Jamie, to deliver Kansas City Star newspapers to coin-operated dispensers in Wyandotte County. Fudge

was driving south on Roe Lane when Henley's car approached from the opposite direction, swerving from lane to lane. Henley's car collided with Fudge's delivery van, throwing Fudge out the open door and pinning him beneath the van until firefighters and emergency medical personnel were able to lift the van off him. James Fudge died twenty days later of injuries received in the accident.

The results of a blood alcohol test taken shortly after the accident showed Henley's blood alcohol level to be .26%. As a result of the accident, Henley was convicted of vehicular homicide and served six months in jail.

The wife and children of James Fudge brought a wrongful death and survival action against Delmar Henley and the City of Kansas City. After a one-week trial, the jury found the decedent 7% at fault, Henley 75% at fault, and the City of Kansas City and the police officers 18% at fault and awarded damages in the amount of $1,095,103.66. The City of Kansas City and the police officers perfected this appeal. Henley was not active in the trial and is not a party to this appeal.

The first issue we will consider on appeal is whether the City of Kansas City was immune from liability for the actions of its law enforcement officers in this case. Determination of this primary issue requires an examination of the Kansas Tort Claims Act, K.S.A. 75-6101 *et seq.* We recently reviewed the concept of governmental immunity and its common-law and statutory history in this state and need not repeat that background discussion here. See *Hopkins v. State,* 237 Kan. 601, 608-09, 702 P.2d 311 (1985).

Basically, the Kansas Tort Claims Act makes governmental liability for tort claims the rule (K.S.A. 75-6103[a]), subject to numerous exceptions (K.S.A. 75-6104). Appellants argue this case fits within three exceptions to the general rule: K.S.A. 75-6104(c), (d) and (m). Prior to considering the application of these exceptions to the present case, we must first consider a preliminary issue.

Before a governmental entity can be liable for damages there must be (1) a negligent or wrongful act or omission by one of its employees; and (2) the employee (a) must be acting within the scope of his employment, and (b) under circumstances where the governmental entity, if a private person, would be liable under

the laws of this state. *Hopkins v. State,* 237 Kan. at 609; K.S.A. 75-6103.

In order for an individual to be liable for a negligent or wrongful act, there must be a duty to act. Appellants, relying upon the "public duty doctrine," argue the City of Kansas City and its police officers did not owe a duty of care to James Fudge. The public duty doctrine provides a governmental entity is not liable for torts committed against a person in absence of a special duty owed to the injured party. Under this doctrine, the police officers owed a duty to the public at large, rather than to any individual. While this issue is raised for the first time on appeal, and thus may not ordinarily be considered (*Lostutter v. Estate of Larkin,* 235 Kan. 154, 166, 679 P.2d 181 [1984]), we hold that because it involves a legal issue arising from proven facts determinative of a significant issue in the case, it will be considered as an exception to the rule. *Wortman v. Sun Oil Co.,* 236 Kan. 266, 271, 690 P.2d 385 (1984); *Pierce v. Board of County Commissioners,* 200 Kan. 74, 80-81, 434 P.2d 858 (1967).

Appellants find support for their argument in *Hopkins v. State,* 237 Kan. at 611, where we stated:

"Defendants correctly state that, as a general rule, the duty of a law enforcement officer to preserve the peace is a duty owed to the public at large. *Absent some special relationship with or specific duty owed an individual, liability will not lie for damages. Robertson v. City of Topeka,* 231 Kan. at 363. *Absent guidelines,* police officers are vested with the necessary discretionary authority to act in an appropriate manner to protect the public." (Emphasis added.)

While *Hopkins* did not turn on this issue and is thus distinguishable from this case, the foregoing statement of law is the key to the police duty in this case. Where the police are subject to guidelines or owe a specific duty to an individual, the general rule does not apply and the police owe a special duty accordingly. Here, the Kansas City Police Department had a standard operating procedure manual which detailed mandatory procedures for handling a variety of police situations. This manual was not made a part of the record. However, the police were also subject to a General Order which set out the procedures to be followed by the police in handling individuals incapacitated by alcohol or drugs. That order (General Order 79-44) was made a part of the record and provides in pertinent part:

"An individual, *male* or *female,* who is incapacitated by alcohol or drugs, and because of such condition, is likely to do physical injury to himself or herself or

others if allowed to remain at liberty will be taken into protective custody and processed in the following manner . . . ."

Thus, the police officers had a duty to take the intoxicated Delmar Henley into protective custody. Appellants argue the officers' testimony that they did not see Henley and were unaware of his intoxicated condition relieves the City of any liability. However, there was also testimony that the police saw Henley from a close proximity and that because of his staggering and belligerent demeanor, the police could not have avoided noticing his intoxicated condition. This conflicting testimony gave rise to a question of fact which was resolved against appellants by the jury.

While we have determined that the police owed a special duty to Delmar Henley, we are now faced with the question of how that special duty became an obligation to James Fudge. The controlling case on this issue is *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982). There, we adopted Restatement (Second) of Torts § 324A (1965), which provides in pertinent part:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) *his failure to exercise reasonable care increases the risk of such harm,* or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." (Emphasis added.)

We reaffirmed *Schmeck* in *Cansler v. State*, 234 Kan. 554, 566-67, 675 P.2d 57 (1984), and *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 295, 672 P.2d 1083 (1983).

The police officers should have realized that taking Henley into protective custody was necessary for the protection of third persons. Their failure to do so significantly increased the risk that Henley would cause physical harm to others. Accordingly, the City of Kansas City is subject to liability to James Fudge for the officers' failure to take Delmar Henley into custody.

We now turn to the issue of whether appellants are immune from liability under any of the exceptions to the Kansas Tort Claims Act. Appellants contend three exceptions are applicable to the facts of the present case: K.S.A. 75-6104(c), (d), and (m).

We will first consider 75-6104(m). That section provides an exception for "failure to provide, or the method of providing, police or fire protection." We discussed this exception in *Jackson v. City of Kansas City*, 235 Kan. 278, 292, 680 P.2d 877 (1984), stating:

"We believe subsection (m) is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized for such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. We do not believe subsection (m) is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection."

The police action in this case does not fall within the scope of K.S.A. 75-6104(m) and the appellants were not immune from liability on this ground.

K.S.A. 75-6104(c) creates another exception from liability for:

"enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, regulation, ordinance or resolution."

This subsection is inapplicable because appellants' liability is based on the police officers' failure to follow mandatory internal rules and not for failure to enforce the laws against driving under the influence of alcohol.

K.S.A. 75-6104(d) grants immunity for:

"any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion be abused."

We discussed this exception as it relates to the actions of police officers in *Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982). In *Robertson,* the plaintiff called the Topeka city police to seek their assistance in removing an intruder. When the police came, they ordered the plaintiff to leave the premises and fifteen minutes later the home burned. We refused to impose liability upon the City or the police because the police actions were discretionary and protected under K.S.A. 75-6104(d). We explained why the City and individual police officers were not liable:

"It would be virtually impossible for police departments to establish specific guidelines designed to anticipate every situation an officer might encounter in the course of his work. *Absent such guidelines*, police officers should be vested with the necessary discretionary authority to act in a manner which they deem appropriate . . . ." p. 362. (Emphasis added.)

Following *Robertson*, we decided *Carpenter v. Johnson*, 231 Kan. 783, 649 P.2d 400 (1982). That case involved the question of whether or not a governmental entity's decisions to place or not to place traffic signs fell within the purview of K.S.A. 75-6104(g), a comparable subsection dealing with road signs. We held the Secretary of Transportation had "adopted the Manual on Uniform Traffic Control Devices for Streets and Highways" and the employees operating under the manual were exercising professional judgment and not discretion and were therefore not immune as a matter of law; therefore, summary judgment was improper in this instance.

Our most recent case in point is *Jackson v. City of Kansas City*, 235 Kan. 278. There, two fire trucks collided, injuring the firemen and damaging property in the vicinity of the collision. A fire department bulletin set a maximum speed limit of 35 m.p.h. for department vehicles. We concluded once the speed limit was established "the City no longer had discretion" and held the City liable if the trucks exceeded the limit.

In the present case the City adopted a specific mandatory set of guidelines for police officers to use with regard to handling intoxicated persons. The guidelines left no discretion and K.S.A. 75-6104(d) is inapplicable to the facts at hand.

We conclude the officers' actions do not fall within the exceptions found at K.S.A. 75-6104(m), (c) and (d) and accordingly, appellants were subject to liability under the Kansas Tort Claims Act.

Appellants next argue since K.S.A. 1985 Supp. 41-715 makes it a misdemeanor for any person to "knowingly" provide liquor to "any person who is physically or mentally incapacitated by the consumption of" alcohol, this court should impose civil liability upon bar owners for such acts. We rejected this argument in *Ling v. Jan's Liquors*, 237 Kan. 629, 703 P.2d 731 (1985). In *Ling*, we held that at common law dispensers of alcohol are not liable to the victims of intoxicated tortfeasors. We then refused to change the common law on grounds that the legislature is best equipped to make such a substantive public policy change. 237 Kan. at 640.

*Ling* is controlling on this issue and there are no grounds for imposing liability upon the vendor.

Alternatively, appellants argue K.S.A. 60-258a requires the fault of the vendor be compared with all other parties even if the vendor cannot be held liable. The common law, as *Ling* makes clear, holds a vendor is not liable to the victims of intoxicated tortfeasors. The vendor is not at fault as a matter of law; therefore, there remains nothing to compare. This issue is without merit.

Appellants next object to jury instruction 10, which pertains to the credibility of a witness. Appellants contend the instruction should have stated that Delmar Henley was convicted of a crime. They contend Henley had an "extensive criminal record" and had been convicted of vehicular homicide as a result of the accident in this case. There is no evidence of Henley's criminal history in the record, nor evidence of a proffer of his "extensive criminal record"; however, the record does establish a conviction for vehicular homicide and shows he served six months in jail for this crime. Since appellants made no effort to introduce evidence of Henley's "extensive criminal record" they cannot complain of error on appeal.

As for Henley's conviction of vehicular homicide, K.S.A. 60-421 requires that before evidence of a conviction may be used to impeach a witness it must be evidence of a crime involving dishonesty or false statement. The crime involved here is vehicular homicide, which is defined at K.S.A. 21-3405 as:

"the killing of a human being by the operation of an automobile . . . in a manner which creates an unreasonable risk of injury to the person or property of another and which constitutes a material deviation from the standard of care which a reasonable person would observe under the same circumstances."

Vehicular homicide does not involve dishonesty or false statement and, hence, failure to give the instruction was not error.

Appellants make numerous objections to Instruction 12, which pertains to the parties' contentions. Appellants' first objection relates to the following statement found in the instruction:

"Plaintiffs claim that defendants, City of Kansas City, Kansas, and Officers Richard Gorham and Robert Conchola caused or contributed to the injuries and death of James E. Fudge in one or more of the following respects:

"(a) In failing to stop and perform field sobriety tests or other tests to determine the intoxicated condition of Delmar Henley."

Appellants object to this instruction on the ground that the

action it requires is discretionary under the Kansas Tort Claims Act. The trial court ruled that the clear and mandatory provisions of the standard operating procedures manual required the police to stop a car swerving out of a parking lot and into the wrong lane, as Delmar Henley's did. Appellants contend no general order, operating procedure, or regulation imposes this duty. The standard operating procedures manual is not a part of the record. It is appellants' burden to create a record sufficient for review. In the absence of such a record, error will not be presumed. *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 602-03, 647 P.2d 1268 (1982). Accordingly, error cannot be predicated on this ground.

The appellants contend it was error not to instruct the jury that James Fudge was not wearing his seat belt. Such an instruction would have been error. In *Ratterree v. Bartlett*, 238 Kan. 11, 18, 707 P.2d 1063 (1985), we adopted the following language from *Taplin v. Clark*, 6 Kan. App. 2d 66, Syl. ¶ 1, 626 P.2d 1198 (1981):

"A passenger in an automobile has no legal duty to use an available seat belt in anticipation of the driver's negligence, and evidence of nonuse is inadmissible under the comparative negligence doctrine either on the issue of contributory negligence or in mitigation of damages."

Just as a passenger has no duty to anticipate the negligence of the driver of a vehicle, a driver need not anticipate the negligence of the drivers of other vehicles and has no duty to use an available seat belt.

Appellants also allege error in the court's failure to instruct on the defendant's allegations of fault against the Sixteenth Round bar and its bartender, Janice Heckman. Given the fact that Kansas has no dram shop liability, this was not error. We find no error in Instruction 12.

For their next contention, appellants argue Instruction 13 should have contained the following language:

"While as a general rule it may be said that a driver, absent knowledge to the contrary, may assume that an approaching vehicle will obey the rules of the road and thus get over and stay on its own side of the road, yet he will not be permitted to act on the assumption where the factual basis for it has disappeared, as for example, where it appears that the driver of such vehicle on the wrong side of the road either will not or cannot turn back to his own side.

"The purpose and object of rules of the road are to avoid accident, but one is not justified in asserting his right to use his side of the road when, by not doing

so, he can avoid a collision. The fact a motorist is on the proper side of the road does not entitle him to make an unreasonable use thereof nor relieve him of the duty to exercise due care to avoid injury to others, including those who may be on the wrong side of the road."

There was no evidence introduced to support this theory; therefore, it was not error to refuse to give the requested instruction.

Appellants next contend Instruction 16 broadens the jury's consideration into areas of discretionary activities. The appellants requested this instruction and therefore waived any objection to it.

Appellants contend the court should have instructed the jury that Delmar Henley's negligence was an intervening cause which cut off the liability of the City. This contention is erroneous because the alleged negligence of the City was in failing to place Delmar Henley in protective custody. Thus, the City's negligence and Delmar Henley's negligence were concurring causes of the injury.

Appellants object to Instruction 19, which allowed the jury to assess fault against "Police officers of Kansas City, Kansas, including but not limited to Officers Richard Gorham and Robert Conchola." Appellants claim prejudice as the introduction of this phrase to the pretrial order on the morning of trial was their first notice that police officers other than Gorham and Conchola would be involved. The appellants made no objection to amending the pleading, nor did they request time to prepare for this "new claim." The potential fault of other police officers had been an issue in the case from the beginning because of the appellees' allegation that Delmar Henley almost hit a third police vehicle after leaving the bar parking lot. We find no error.

Appellants contend that the verdict form was improper because items of damages were separated into several categories and the form "allowed the jury to have numerous blanks to complete, which understandably led to a larger verdict." Appellants cite no authority supporting their position. Further, they did not object to the form. In order to overcome their failure to object, appellants must show the verdict form, as a part of the instructions, was clearly erroneous. *Lostutter v. Estate of Larkin*, 235 Kan. 154, 164, 679 P.2d 181 (1984).

We discussed the problem of verdicts which are irregular as to

form in *Mackey v. Board of County Commissioners,* 185 Kan. 139, 150, 341 P.2d 1050 (1959).

"The trial court submitted two verdict forms to the jury. The jury by mistake completed both verdict forms and returned them into court. The one form indicated that the jury had found for the defendant on each count of the petition. The other, intended as a verdict form should the plaintiff be entitled to recover, was worded so that the jury was required to fill in the amount which the plaintiff was entitled to recover on each of the six counts. In each of these six blank spaces was written the word 'None.' The verdict which the jury returned was clearly apparent from both forms. The plaintiff's objection has no merit. So long as the verdict manifests the intention and findings of the jury upon the issues submitted to them, it will not be overthrown merely because of defects in form."

We find further discussion at 76 Am. Jur. 2d, Trial § 1141:

"In the absence of some express provision of the practice statutes or the governing rules of practice prescribing the form of the general verdict to be returned, there is no hard and fast rule governing such form. The responsibility of returning a true verdict rests with the jury, and it is a matter of accommodation, and not a legal requirement, that the trial judge supply the jury with the proper forms in any given case. Any words which convey the meaning and intention of the jury are usually deemed to be sufficient. A verdict is sufficient in form if it expresses the decision of the jury on the issues submitted so as to enable the court to intelligibly render a judgment thereon. So long as the verdict manifests the intention and findings of the jury upon the issues submitted to them, it will not be overthrown merely because of defects of form."

The verdict in this case clearly expresses the intentions and findings of the jury and we find no error.

Appellants next allege the trial court erred in prohibiting the admission of evidence of Deborah Fudge's remarriage, including voir dire of the jurors about whether any of them knew Deborah (Fudge) Abels or her current husband. This prohibition was based on the trial court's conclusion that the potential prejudice of such evidence outweighed its probative value. In *Pape v. Kansas Power & Light Co.,* 231 Kan. 441, 447, 647 P.2d 320 (1982), we adopted a rule excluding evidence of a surviving spouse's remarriage in mitigation of damages. The appellants are taking a different approach by arguing the purpose of admitting the evidence is to protect the integrity of the jury process. We hold evidence of the remarriage of a surviving spouse is inadmissible in a wrongful death case and the court correctly exercised its discretion in refusing to admit the evidence. *Cf. Betts v. General Motors Corp.,* 236 Kan. 108, 114-15, 689 P.2d 795 (1984); *Talley v. J & L Oil Co.,* 224 Kan. 214, 220, 579 P.2d 706 (1978).

The jury awarded $50,000 for pain, suffering, disabilities or disfigurement and any accompanying mental anguish. Appellants contend the evidence does not support this award. Mr. Fudge lost consciousness a few minutes after the accident and never regained consciousness. Medical records showed he did not respond to stimuli. Appellants' witness, Dr. Alan Hancock, the Wyandotte County Coroner, testified Mr. Fudge was in such a deep state of unconsciousness he could have felt no pain. He further testified that records of KARE (a Kansas City emergency ambulance service) showed Mr. Fudge lapsed in and out of consciousness for ten minutes after the accident. Shirley Magee, Deborah Fudge's mother, countered with testimony that three days after the accident James Fudge squeezed her fingers twice in response to things she told him about the children, and that it happened two or three more times before he died. Thus, the issue was controverted, resulting in a question of fact for the jury.

In *Tucker v. Lower*, 200 Kan. 1, 9, 434 P.2d 320 (1967), we held:

"There is no exact yardstick by which pain and suffering can be measured and the various factors involved are not capable of proof in dollars. For this reason the only standard for evaluation is such amount as twelve reasonable persons estimate to be fair compensation when that amount appears to be in harmony with the evidence and arrived at without passion or prejudice."

The amount arrived at by the jury in this case is supported by competent evidence and there has been no showing that the award was the result of passion or prejudice. We find no error.

Appellants next object to the exclusion of a portion of a witness' deposition relating to the speed of the vehicles. The witness, Buford Botteron, died before trial. The judge excluded this evidence because the deposition laid no foundation for showing that the witness was in any position to determine the speed of the vehicles. Appellants do not address the foundation issue and the deposition is not part of the record on appeal. We find no error.

Appellants next argue the jury's reconsideration of its verdict is reversible error. The first verdict form returned by the jury contained an award of $632,000.00 for loss of time or income between July 30, 1981, and August 20, 1981. This was an obvious mistake. Upon observing the error, the judge pointed it out to the jury and asked them to make sure the verdict reflected their intent. The jury retired for a few minutes and returned with a

new verdict form which gave *no* compensation for the July 30-August 20 period. Under K.S.A. 1985 Supp. 60-248(g), the trial judge has discretion to have the jury correct its defective verdict. That statute provides:

"Whenever the jury consists of 12 members, the agreement of 10 jurors shall be sufficient to render a verdict. In all other cases, subject to the stipulation of the parties as provided in subsection (a), the verdict shall be by agreement of all the jurors. The verdict shall be written, signed by the presiding juror and read by the clerk to the jury, and the inquiry made whether it is their verdict. If less than the required number of jurors agree, the jury must be sent out again. If agreement of the required number is expressed, and no party requires the jurors to be polled individually, the verdict is complete, and the jury discharged from the case. If the verdict is defective in form only, it may be corrected by the court, with the assent of the jury, before it is discharged."

The trial judge did not err in allowing the jury to reconsider its verdict.

Appellants next contend the evidence is insufficient to sustain the jury's damages award of $1,095,103.66. When a verdict is attacked on the ground it is contrary to the evidence, it is not the function of this court on appeal to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in a light most favorable to the successful party below, will support the verdict this court should not intervene. *Manley v. Wichita Business College*, 237 Kan. 427, 432, 701 P.2d 893 (1985). Applying this standard, the award should be upheld.

The appellees presented expert testimony by David E. Shulenburger, who is a professor of business administration at the University of Kansas. His calculations showed a present value of lost wages of $499,739.00, based on a projected lifetime earning of $1.7 million. He further figured a present value of $46,981 for lost services (the economic value of work performed in and around the home). These figures were based on projections from the date of trial. Added to that were the value of lost wages and services since James Fudge's death to the date of trial for a total of $688,254.00. The lifetime totals were based on an assumed rate of inflation of 5.39% for the lost services (which represents the 31-year average annual increase from 1950-1981) and an annual increase in wages of 5.24% (which represents the national annual average for the twenty-five years from 1957-1982). These present day values assumed an investment (in government bonds) at the then current rate of 11.25%. However, the average

return for the previous 25.8 years on government bonds has been 7%. Use of the 7% figure would produce a present value for wages and services, from the date of trial, in the vicinity of $900,000.00. The jury verdict of $1,095,103.66 was well within this limit where the wages and services lost before trial ($141,534) are added in, and the award should be upheld.

The judgment is affirmed.

LOCKETT, J., concurring: I agree with the majority decision, except where the majority finds that § 324A of the Restatement (Second) of Torts creates a special relationship between Kansas City police officers and a motorist who was later injured in an automobile accident with a drunk driver. Both the officers' and the City's liability are subject to the Kansas Tort Claims Act and its exceptions. Restatement (Second) of Torts § 324A is not an exception to the immunity provided governmental entities and law enforcement officers by the Kansas Tort Claims Act.

Before the City can be liable for damages there must be (1) a negligent or wrongful act or omission by one of its employees; and (2) the employee (a) must be acting within the scope of his employment and (b) under circumstances where the governmental entity, if a private person, would be liable under the laws of this state. *Hopkins v. State*, 237 Kan. 601, 702 P.2d 311 (1985). For the police officers to be individually liable for a negligent or wrongful act, there must be a duty to act. Individual liability of police officers is limited by the "public duty doctrine." The public duty doctrine provides that neither a governmental entity nor its police officers are liable for torts committed against a person in the absence of a special duty owed to the injured party. A police officer's duty to enforce the law is owed to the public at large, rather than to any individual, absent some special relationship with or specific duty owed an individual. *Robertson v. City of Topeka*, 231 Kan. 358, 644 P.2d 458 (1982).

K.S.A. 65-4027(A) and 65-5203(a) allow a law enforcement officer to take into custody any person who is intoxicated or incapacitated by alcohol or drugs that is a danger to himself or others. The City of Kansas City had adopted General Order 79-44 which required the officers to take into protective custody individuals incapacitated by alcohol or drugs that might injure themselves or others.

Ignoring the fact that the officers had specific statutory au-

thority and a specific duty under the general order to protect third parties from individuals incapacitated by alcohol or drugs, the majority simply states that under *Schmeck v. City of Shawnee*, 232 Kan. 11, 651 P.2d 585 (1982), which adopted Restatement (Second) of Torts § 324A (1965), a special duty was owed by police officers to James Fudge. For additional authority, the majority cites *Ingram v. Howard-Needles-Tammen & Bergendoff*, 234 Kan. 289, 672 P.2d 1083 (1983), and *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984).

The majority's reliance on these cases is misplaced. Not one of the cited cases implies that the failure to enforce a law creates a special duty to a third party, resulting in liability for a governmental entity or individual police officers. In *Schmeck*, the plaintiff was injured when the motorcycle he was riding was struck by an automobile. The city was not exempt from liability for a street defect under the Kansas Tort Claims Act. The city was held responsible because of a street defect. Kansas City Power and Light (KCPL) had contracted with the city to design its traffic signal system. KCPL was found negligent when it failed to include a traffic signal in its design for the city traffic system. Based on § 324A, it was KCPL that was responsible to the plaintiff, not the city.

In *Ingram*, the surviving spouse recovered damages for the wrongful death of her husband. The husband was injured and died when the truck he was driving struck a hole in the traffic lane on a bridge and plunged nearly 30 feet to the ground. The plaintiff sued both the Kansas Turnpike Authority (KTA) and the engineers hired by the KTA to inspect the bridges. KTA was found negligent under the statutes that required KTA to provide a safe highway. The engineers were liable to the plaintiff because they had failed to fulfill the implied duties under their employment contract with the KTA. The rationale of *Schmeck* and § 324A were used to impose liability on the engineers to an injured third party.

In *Cansler*, several armed prisoners escaped from Lansing Penitentiary in an automobile. The defendant, Leavenworth County, had an agreement with the penitentiary to warn surrounding law enforcement agencies of escapes from the penitentiary. The County failed to warn the plaintiff, a law enforcement officer, of the escape. The officer attempted to stop a

speeding car. The occupants of the vehicle, the escaped prisoners, abandoned the car. Not knowing that he was after armed escaping prisoners, the officer gave chase on foot. When he attempted to capture the prisoners, he was shot and wounded. The County was found to owe the plaintiff a duty under § 324A to warn the plaintiff of the escape because of its contract with the penitentiary. The *Cansler* court determined there was a breach of a duty owed to a third party arising from the contract.

The majority has misapplied § 324A in this case. By its decision, the majority has judicially repealed a major portion of the Kansas Tort Claims Act and overruled *Robertson*.

The Kansas Legislature has taken action to protect users of our highways from drivers that are intoxicated or incapacitated by alcohol or drugs. K.S.A. 65-4027(A) and 65-5203(a) impose authority on law enforcement officers to arrest an intoxicated or incapacitated driver, to protect not only the impaired driver but also others. Here the special authority was created by statute and the duty was created by the general order adopted by the City. It was not a duty imposed under *Schmeck*.

McFarland, J., concurring in part and dissenting in part: The facts in certain areas need to be stated with more specificity. On the evening of July 29, 1981, defendant Henley, along with his wife and some of her relatives, was drinking in a private club situated at 2847 Roe Lane in Kansas City, Kansas. The only club employee present was the bartender, Janice Heckman. Henley became loud and obnoxious in his behavior. Closing time for the club was 2:00 a.m. Shortly before closing time, Heckman asked Henley to leave. He refused. David Sparks, a club patron who was a personal friend of Heckman's, tried to assist her in getting Henley to leave. Henley did not leave. Heckman advised Henley that if he would not leave, she would call the police. Still, Henley did not leave. Heckman then called the Kansas City, Kansas, police department reporting a *disturbance in the club*. The call was made at approximately 1:45 a.m. Henley and his party then moved to the parking lot. Sparks and Henley continued to argue in the parking lot. No customers remained in the club and Heckman watched from outside the front door. The parking lot was dark except for a dim light from a billboard. Only two or three cars and a few persons were present in the parking lot.

Officer Gorham was first on the scene. He arrived at 1:48 a.m. (approximately three minutes after the call was received). David Sparks walked over to the police car and talked with Officer Gorham. The two were old acquaintances. The police dispatch had reported a *disturbance at the club. There was no one in the club at this time.* Sparks told Gorham the disturbance was over as the party causing the disturbance had left the club. About this time (1:50 a.m.), a second police car arrived—driven by Officer Conchola. This officer saw Sparks and Gorham talking and pulled in close. Gorham advised Conchola the trouble (disturbance) was over. This was wholly consistent with the scene viewed by both officers. Neither saw any disturbance at any time. Only a few cars and a handful of patrons remained in the parking lot. Gorham told the few remaining patrons to leave. There is no evidence either officer had a personal two-way conversation with Henley. Gorham simply addressed a general go-on-your-way instruction to the little group of patrons standing by the patrons' parked cars. Another police car arrived and departed after being told and seeing that the trouble was over. All police cars were gone from the scene within approximately seven minutes after the first had arrived.

Heckman finished closing up the club and came out to go home shortly after closing time. No police cars remained on the scene. Heckman then saw Henley drive out of the parking lot and nearly strike a police car proceeding in the opposite direction on Roe Lane. Heckman stated the vehicle was not one of the police cars that had responded to the disturbance call. She testified it was a black and white vehicle and she did not know whether it was a Kansas City, Kansas, police vehicle. There was evidence that a number of police departments in Johnson County had, in July of 1981, black and white, or dark blue and white, or dark green and white, police vehicles (any of which could appear black and white at night), and that they often proceeded down Roe Lane returning to their own areas.

The tragic accident that cost James Fudge his life occurred on Roe Lane approximately a block and a half from the club. It was so close to the club that Heckman heard the collision from the parking lot and was the first person on the scene. There was no evidence the officer driving the unidentified police vehicle could have turned around and stopped the Henley vehicle prior to the Fudge collision even if he or she had tried to do so.

Under the instructions given herein, the jury could find liability on behalf of defendant City on the basis of the acts of Gorham or Conchola or any other Kansas City, Kansas, police officers (presumably referring to the driver of the unidentified police car which may or may not have been defendant City's vehicle).

Disregarding the question of immunity for the time being, we must first consider the threshold question of whether or not defendant City (and its officers) committed a tort. Under the evidence most favorable to plaintiff, Gorham was close enough to Henley in the parking lot to see he was intoxicated. Assuming the officer should have seen and correctly evaluated Henley's intoxicated condition, did the officer breach some duty owed to James Fudge by not administering full sobriety tests to Henley and, assuming Henley failed same, taking Henley into custody? Did the officer breach some duty to Fudge in not entering the club and talking to Heckman?

In *Robertson v. City of Topeka*, 231 Kan. 358, Syl. ¶ 1, 644 P.2d 458 (1982), a property owner, Robertson, called the police for assistance in removing an intoxicated trespasser from his property. Robertson told the officers who arrived on the scene that he was afraid the trespasser would burn down the house if not removed immediately. The officers would not remove the trespasser and asked Robertson to leave. Fifteen minutes later the intoxicated trespasser set fire to the house. Robertson sued the officers and the city for damages. In affirming the district court's dismissal of the case, this court held there was no liability as a matter of law on two grounds:

1. The duty of a law enforcement officer to preserve the peace is a duty owed to the public at large, not to a particular individual. Absent some special relationship with or specific duty owed an individual, liability will not lie for damages; and

2. Immunity under the discretionary function or duty exception (K.S.A. 75-6104[d]) contained in the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*).

Thus the court found there was no duty owed Robertson under the circumstances and there could, accordingly, be no breach thereof. That is, *there was no tort* as a matter of law. Secondly, even if there had been a tort, defendants were immune under

K.S.A. 75-6104(d). In *Robertson*, the officers were in direct contact with the person injured prior to the injury and directed him to leave. Still there was no special relationship such as to create liability. In the case before us, no officers were in contact with Fudge—he was purely and simply a member of the public at large. This is a much weaker factual situation than that present in *Robertson*.

The majority attempts to create a special relationship through the fact Henley was an intoxicated person. This is fallacious. Police officers have a duty to arrest lawbreakers. Crimes and offenses are set forth in statutes. It is not necessary to grant officers specific authority to arrest in each statute defining a crime or offense. Instead, the authority to arrest is set forth in one statute applicable to all crimes. That statute is K.S.A. 1985 Supp. 22-2401, which provides:

"A law enforcement officer may arrest a person under any of the following circumstances:

(a) The officer has a warrant commanding that the person be arrested.

(b) The officer has probable cause to believe that a warrant for the person's arrest has been issued in this state or in another jurisdiction for a felony committed therein.

(c) The officer has probable cause to believe that the person is committing or has committed:

(1) A felony; or

(2) a misdemeanor, and the law enforcement officer has probable cause to believe that:

(A) The person will not be apprehended or evidence of the crime will be irretrievably lost unless the person is immediately arrested;

(B) the person may cause injury to self or others or damage to property unless immediately arrested; or

(C) the person has intentionally inflicted bodily harm to another person.

(d) Any crime, except a traffic infraction, has been or is being committed by the person in the officer's view."

If an officer sees a person acting very suspiciously in a residential area at night, he would have authority to arrest the person. He would have a duty to investigate the suspicious conduct. However, if he fails to investigate and a home in the area is subsequently burglarized, the owner thereof has no cause of action against the officer and his employer as there is no special duty owed the homeowner. The duty owed was to the public at large. A special duty could arise if an officer tells a homeowner he believes that the home will be burglarized that night, but that the homeowner should take no defensive action as

police will be continually watching the house and will make sure that no damage or loss occurs. If, under such circumstances, the police fail to watch the home, and the homeowner acts in reliance on the earlier statements to his detriment, breach of a special duty owed the homeowner could well be found.

The majority holds failure to take an intoxicated person (as opposed to a criminal) into custody creates some special relationship between the officer and every member of the public. There is simply no legal basis for this conclusion.

In earlier days, police were permitted to take a rather paternalistic view of what were commonly known as drunks and "crazies." Through general statutes making criminal offenses of loitering, vagrancy, disturbance of the peace, and disorderly conduct, intoxicated and insane persons could be arrested, transported or detained with little formality. In recent years, however, the strong trend has been to eliminate this loose procedure. Police can no longer arrest a drunken or insane person who is committing no crime or is causing no trouble or who is not likely to cause trouble. The drunken or insane person sitting quietly on a park bench in the spring sunshine cannot be hassled by the police, however disreputable or disagreeable his or her appearance may be. Generally, intoxicated persons, drug addicts, insane persons and mentally deficient individuals have the right to go their own way undisturbed as long as they do not violate a law. Should treatment be necessary for their own safety, or the safety of others, formal commitment proceedings are available. The rights of the individuals with such afflictions are safeguarded. There are, however, situations where time-consuming commitment proceedings are not feasible. Something needs to be done immediately. In these emergency situations, officers are empowered to act.

K.S.A. 59-2908(a) provides:

"(a) *Any peace officer who has reasonable belief upon observation, that any person is a mentally ill person and because of such person's illness is likely to do physical injury to himself or herself or others if allowed to remain at liberty may take such person into custody without a warrant.* Said officer shall transport such person to any treatment facility where such person shall be examined by a physician on duty at such facility. If no physician is on duty at the time such person is transported to the facility, such examination shall be made within a reasonable time not to exceed seventeen (17) hours. If a written statement is made by such physician at the treatment facility that after preliminary examination such physician believes such person to be a mentally ill person and because

of such person's illness is likely to do physical injury to himself or herself or others if allowed to remain at liberty, and if such treatment facility is willing to admit such person the peace officer shall present to such treatment facility the application provided for in subsection (b) of K.S.A. 59-2909. If the physician on duty at the treatment facility does not believe such person to be a mentally ill person, the peace officer shall release such person." (Emphasis supplied.)

## K.S.A. 65-5203(a) provides:

"(a) *Any law enforcement officer who has reasonable belief, upon observation, that any person is intoxicated or incapacitated by drugs and because of this condition is likely to be injured or to injure others if allowed to remain at liberty may take such person into custody without a warrant.* The officer shall transport the person to any treatment facility where such person shall be examined by a physician or psychologist at the facility. If no physician or psychologist is available at the time the person is transported to the facility, such examination shall be made within a reasonable time not to exceed 17 hours. If a written statement is made by such physician or psychologist at the treatment facility that after preliminary examination the physician or psychologist believes the person to be intoxicated or incapacitated by drugs and because of this is likely to do physical injury to self or others if allowed to remain at liberty, and if such treatment facility is willing to admit such person, the law enforcement officer shall present to the treatment facility the application provided for in K.S.A. 65-5204. If the physician or psychologist does not believe the person is intoxicated or incapacitated by drugs, the law enforcement officer shall release the person." (Emphasis supplied.)

## K.S.A. 65-4027(A) provides:

"(A) *Any law enforcement officer who has reasonable belief, upon observation, that any individual is intoxicated or incapacitated by alcohol and because of this condition is likely to be physically injured or to physically injure others if allowed to remain at liberty may take such individual into custody without a warrant.* The officer shall transport such individual to any treatment facility, or other facility for care or treatment, which has a physician or psychologist on staff where such individual shall be examined by a physician or psychologist at such facility. If no physician or psychologist is available at the time such individual is transported to the facility, such examination shall be made within a reasonable time not to exceed 17 hours. If a written statement is made by such physician or psychologist at the treatment facility that after preliminary examination such physician or psychologist believes such individual to be intoxicated or incapacitated by alcohol and because of this is likely to be physically injured or to physically injure others if allowed to remain at liberty, and if such treatment facility is willing to admit such individual the law enforcement officer shall present to such treatment facility the application provided for in subsection (B) of K.S.A. 65-4028 and amendments thereto. If the physician or psychologist does not believe such individual to be intoxicated or incapacitated by alcohol, the law enforcement officer shall release such individual." (Emphasis supplied.)

Thus, on the authority of these three statutes, police, in an emergency situation, may detain an insane person or person

intoxicated or incapacitated by drugs or alcohol and take such person to an appropriate treatment facility where a medical evaluation of his condition can be made. Such legislation is necessary. An insane, alcohol intoxicated, or drug addicted individual lying late at night in the snow in bitter weather can be taken for treatment without the filing of a formal commitment procedure the next day. Failure to take an insane, alcohol intoxicated or drug addicted person into custody does not create a special duty to every member of the public. To hold otherwise makes the officer (and his employing governmental unit) the insurer of the public against later harm caused by the individual.

The clear intent of the Act for Obtaining Treatment for a Mentally Ill Person (K.S.A. 59-2901 *et seq.*); the Act for Treatment of Drug Abusers (K.S.A. 65-5201 *et seq.*); and the Alcoholism and Intoxication Treatment Act (K.S.A. 65-4001 *et seq.*) is to provide treatment for such afflicted persons with numerous safeguards to the rights of the patients. Formal proceedings are the rule. The formalities are permitted to be dispensed with only in a limited manner in an emergency situation and then a medical judgment has to be made very shortly after the emergency detention. I believe the majority opinion will have, as one effect, an expansion of the limited emergency detention provision of these acts. If police officers are to be the insurers of the public for acts done by alcohol intoxicated persons, insane persons and drug addicts, then they will, of necessity, detain any individual who might possibly be a danger to himself or others. An officer failing to arrest an individual who has committed a crime or who gives probable cause to believe criminal conduct is imminent is not the insurer of the public against future harm caused by such person. Therefore, noncriminal persons who may be insane or intoxicated by drugs or alcohol will be subject to a far greater risk of detention by the police than those involved in possible criminal conduct. This is contrary to the modern concept of rights of the individual. A good example of the type of situation where the change could occur is present in the facts before us. An officer (not one of the named defendants) heard the disturbance call dispatch in question before us. On his way to respond he saw some individuals walking down the street near the scene. Thinking they were from the club (which they were), he stopped near them and asked some questions. He testified all

had been drinking but he did not think they were in such a bad way that they should be placed in protective custody for intoxication. Let us suppose one of them had later walked in front of a car—causing injuries to himself and occupants of the car. Under the majority opinion, the officer is the insurer of these individuals and responsible for any harm caused by them. The officer under the new rules enunciated in the majority opinion might well act differently when the same situation arises in the future. Officers may, in responding to dispatch calls, spend more time checking bystanders for drug or alcohol intoxication or insanity than finding the culprit or treating the injured victim. .

The majority opinion relies heavily on the Kansas City Police General Order No. 79-44 which provides:

"An individual, *male or female,* who is incapacitated by alcohol or drugs, and because of such condition, is likely to do physical injury to himself or herself or others if allowed to remain at liberty will be taken into protective custody and processed in the following manner . . . ."

This order implements K.S.A. 65-5203(a) and K.S.A. 65-4027(A) relative to emergency detention of persons intoxicated or incapacitated by drugs or alcohol. It uses the words "will be taken" rather than "may take" as found in the statutes, but cannot expand the statutory authority to detain. The order creates no new duty to the public at large, of which James Fudge was a member. Any violation thereof is not a lawful basis of liability for the death of James Fudge. Violation of a general order makes the officer subject to departmental discipline.

Inasmuch as the majority concludes the officers did breach some special duty to James Fudge, and that, accordingly, the officers committed a tort against James Fudge, it is necessary to discuss the Kansas Tort Claims Act (K.S.A. 75-6101 *et seq.*). I agree with the majority that immunity herein is not afforded through the exceptions from liability contained in K.S.A. 75-6104(c) (enforcement or failure to enforce a law) or K.S.A. 75-6104(m) (failure to provide police protection).

I do not agree with the majority that K.S.A. 75-6104(d) (discretionary function or duty) is inapplicable. K.S.A. 75-6104 provides in part:

"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

. . . .

(d) any claim based upon the exercise or performance or the failure to exercise

or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion be abused;"

Liability herein is based on the defendant officers' conduct in failing to detain and place Henley in protective custody. The majority likens the situation herein to that in *Jackson v. City of Kansas City*, 235 Kan. 278, 680 P.2d 877 (1984). In *Jackson* two fire trucks collided. One was being operated in an unsafe manner in excess of the Kansas City Fire Department's regulation relative to maximum speed at which fire trucks were to be driven. In rejecting the claim of immunity under the discretionary function exception (K.S.A. 75-6104[d]), the court, in an opinion authored by myself, stated:

"[I]t would be difficult to visualize a situation where just the actual physical operation of a motor vehicle upon the highway would be a 'discretionary function or duty' within the meaning of section (d)." 235 Kan. at 288.

Physical operation of a motor vehicle is clearly not a discretionary function. Neither is the engineering decision of where to place traffic signs utilizing a standard manual a discretionary function (see *Carpenter v. Johnson*, 231 Kan. 783, 649 P.2d 400 [1982]). In order to have authority to detain Henley, the officers herein had to have a reasonable belief, "upon observation," that Henley was "intoxicated or incapacitated by alcohol and because of this condition is likely to be physically injured or to physically injure others if allowed to remain at liberty." This is a probable cause standard. Failure of an officer to believe he or she has probable cause for an arrest of a criminal suspect or detention of an alcohol or drug intoxicated person or a mentally ill person is as discretionary as an act can get. In a given set of circumstances, one officer might believe he or she had probable cause to arrest or detain; another officer under like circumstances might not. In a given set of circumstances, one officer might warn a speeding motorist while another would issue a citation.

In the case before us, the officers were dispatched on a call reporting a disturbance inside a private club. When the first officer arrived he was told by an acquaintance the disturbance was over and the instigator had left. It was undisputed there was then no disturbance inside the club. When the officer arrived there was no disturbance in the parking lot. The trouble the police had been called to quell no longer existed. It was the closing time of the club. The trouble was over. The police

dispersed. Under these circumstances, the majority grants no discretion to the officers responding to the call. Liability is imposed for failure to check out all persons in the parking lot. Suppose 25 people had been standing quietly in the parking lot when the officers arrived. At approximately 2:00 a.m. in a bar parking lot, it is safe to assume a sizeable percentage of patrons would show at least some indicia of intoxication. Does an officer have a ministerial duty to check each person and administer field sobriety tests to all who do not speak clearly or seem a little unsteady on their feet and then decide just who does or does not meet the statutory criteria?

Unlike a speeding motorist, the officer does not get a digital read-out on the ultimate question. He or she must rely on his or her own judgment and experience. Clearly, the officers' failure to place Henley in protective custody was a matter of discretion.

I would reverse the judgment against the defendant police officers and the City of Kansas City.

SCHROEDER, C.J., joins the foregoing concurring and dissenting opinion.