(10 P.3d 27)

No. 84,489

JAMES S. KIRK and DARLENE MULLIN, Executrix of the Estate of Kathryn Stewart Morse, Deceased, *Appellants*, v. CITY OF SHAWNEE, KANSAS, *Appellee*.

Opinion filed August 11, 2000.

*Donald W. Vasos* and *David A. Hoffman*, of Vasos Law Offices, of Fairway, for the appellants.

*Steven G. Piland*, of Law Offices of Piland & Magruder, of Kansas City, Missouri, for the appellee.

Before LEWIS, P.J., PIERRON, J., and DAVID W. KENNEDY, District Judge, assigned.

KENNEDY, J.: Appellants James S. Kirk, as heir at law, and Darlene Mullin, as executrix of the estate of Kathryn Stewart Morse, deceased, sued the City of Shawnee (City) for the police department's failure to protect Morse from her estranged husband. Appellants appeal from the entry of summary judgment in favor of the City.

Kathryn Stewart Morse and Roland James Morse were married. In September 1997, Kathryn filed for divorce in Johnson County District Court. On September 15, 1997, she filed a petition for protection from abuse (PFA). At this time, the court issued a temporary PFA order, prohibiting Roland from contacting Kathryn or entering their house in Shawnee. Roland also was ordered to turn over a handgun to the sheriff.

On September 16, 1997, Kathryn completed a "house watch" form and delivered it to the Shawnee Police Department. The form indicated that she had a PFA order against Roland, that he had threatened her life, and that he possessed a gun.

On September 17, 1997, Kathryn called the Shawnee Police Department to report that Roland had violated the PFA order. The police dispatcher confirmed a PFA order had been entered and dispatched an officer to Kathryn's residence to take a report. However, Kathryn was not at home when she made the call, but was in the police station. By the time the dispatcher determined the source of the call, Kathryn had left. On the same day, Shawnee police were notified that Roland had removed a gun from the house prior to being served with court papers and that Roland was extremely upset.

On September 18, 1997, Kathryn obtained a long-term PFA order—valid for 5 months—which prohibited Roland from entering or approaching their residence. The order contained the statutory language stating: "Law enforcement officers are directed to grant any assistance necessary to protect the plaintiff . . . from abuse by the defendant, and to provide any other assistance necessary to enforce these orders."

In addition, the PFA order allowed Roland access to the residence the evening of September 18 and all day September 19 to remove personal belongings and business records. During the hearing, Kathryn's attorney commented they wanted a third person in the house while Roland was there, and the court agreed it was a good idea. During this hearing, Roland advised the court he had taken the revolver he was ordered to deliver to the sheriff and had delivered it to his son for safekeeping.

Kathryn talked to a police dispatcher in the mid-afternoon of September 18. This conversation was recorded. During the conversation with the dispatcher, Kathryn advised the dispatcher that Roland had changed his arrival time and they were "shooting for" 7:30 p.m. Kathryn told the dispatcher "I will let you know as soon as I know."

Minutes later, Kathryn talked with Sergeant Rob Moser. Kathryn advised Moser her husband had threatened her in the past and had a gun. When she asked for police presence at the home while Roland was there, Sergeant Moser advised Kathryn they could not keep an officer at her home for extended periods of time. He suggested she call a private security company or talk to another officer about police officers who might be willing to provide security while off-duty.

Sergeant Moser offered to send two officers to her home, if they were available, for a short period of time when Roland arrived. Sergeant Moser specifically advised Kathryn to call back shortly before or when Roland arrived and they would send officers over to the home for a few minutes. Sergeant Moser also advised Kathryn to stay near the phone and to call 911 if matters deteriorated.

That same day, Kathryn's aunt, Geraldine (Gerry) Stewart, called and requested an officer to come out and protect Kathryn. Stewart wanted an officer to come out to stay with them while Roland was in the house. There was no indication Roland was at the house or what time this call took place. Again, the dispatcher advised they could not send out a police officer simply to sit there while Roland was there for an extended period of time.

The next day, Roland shot and killed Kathryn at their home and then killed himself. At the time, Tommy Smith (a friend of a friend) was at Kathryn's house to provide her some protection. According to Smith, Roland arrived that morning, went down to the basement, and began taking boxes out to his truck. Smith, Kathryn, and Stewart were eating in the kitchen when Roland reentered the home with a shotgun. Roland used the gun to force Smith out the door of the house. The shootings then occurred.

Under policies of the Shawnee Police Department at the time, certain standards were established for enforcing PFA orders, in-

cluding completing reports on all violations of a PFA order. The standards provided that the department's policy was the "vigorous enforcement of laws relating to domestic violence." Dispatchers were required to give domestic violence calls the same priority as any other life-threatening call. The department also had a policy for assisting in civil matters (a "civil standby") in order to preserve the peace in situations involving evictions, transfer of custody of children, and other civil matters.

In 1998, appellants James S. Kirk, Kathryn's son, and Darlene Mullin, the executrix of Kathryn's estate, filed a wrongful death and survivor action against the City and Roland's estate. The appellants claimed the City had breached a specific duty owed to Kathryn and had been negligent in failing to protect her from Roland. In answering the petition, the City asserted it was immune under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*

After discovery was conducted, the City filed a motion for summary judgment. The City argued it was entitled to summary judgment because it had immunity under the KTCA—specifically, under the exceptions to liability—the failure to provide police protection. In controverting the City's motion, plaintiffs disputed some of the City's facts by inferring the department's actions discouraged Kathryn from calling the police and/or gave her no reasonable expectation that the City would protect her. The plaintiffs argued the City owed a duty to Kathryn based on the PFA order and the City's mandatory policies for handling domestic abuse cases.

In a memorandum decision, the trial court set forth its findings of fact which mirrored the factual statements from both parties' briefs. The trial court held that the City, through its police department, owed no individualized duty to Kathryn and that, as a result, the City was immune from liability under the discretionary function exception of the KTCA. Thereafter, two journal entries dismissing the claims against the City were filed on the same day. The next day, the plaintiffs filed their notice of appeal.

## SPECIFIC INDIVIDUALIZED DUTY TO KATHRYN MORSE

On appeal, appellants challenge the trial court's ruling that the

City, through its police department, did not owe an individualized duty to protect Kathryn from Roland. Plaintiffs allege that a duty existed based on the mandatory policies of the police department and the language of the PFA order.

In order to establish liability for negligence against any defendant, including a governmental entity, the plaintiff must establish: (1) the defendant owed a duty to the plaintiff; (2) that duty was breached; (3) the breach was the proximate cause of the plaintiff's injury; and (4) the plaintiff sustained damages. *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, 397, 931 P.2d 26 (1997). If there is no duty, there can be no claim of negligence. Whether a duty exists is a question of law, and our review is unlimited. *Nero v. Kansas State University*, 253 Kan. 567, 571, 861 P.2d 768 (1993).

## The Public Duty Doctrine

When a negligence claim is asserted against a governmental agency, the court must consider the so-called "public duty doctrine." That doctrine establishes the general principle that a governmental agency owes duties to the public at large rather than to individuals. *Fudge v. City of Kansas City*, 239 Kan. 369, 372, 720 P.2d 1093 (1986). Under this doctrine, the fact the governmental entity owes a legal duty to the public at large does not establish a basis for an individual to claim the agency owed a legal duty to him or her personally. *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 631, 938 P.2d 1293 (1997). No duty exists unless the plaintiff establishes that the agency owed a special duty to the injured party. *Fudge*, 239 Kan. at 372.

Situations where a "special duty" have been found vary greatly. However, the cases generally fall into two categories. One is where a special relationship existed between the governmental agency and the wrongdoers (*i.e.*, the State has custody of the wrongdoer). See, *e.g.*, *Cansler v. State*, 234 Kan. 554, 564-65, 675 P.2d 57 (1984) (State correctional officials owe a special duty to nearby residents to exercise reasonable care in maintaining prison security and issuing warnings when dangerous inmates escape); *Washington v. State*, 17 Kan. App. 2d 518, 523, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) (prison officials owe duty of reasonable care

to safeguard a prisoner in their custody or control from attack by other prisoners). The second category involves cases where a special relationship existed between the agency and the injured person. See *e.g.*, *C.J.W. v. State*, 253 Kan. 1, 12, 853 P.2d 4 (1993) (State had duty to warn of a detained child's propensity toward violence and to protect other children in custody from the violent child); *Nero*, 253 Kan. at 584-85 (state university, as landlord of dormitory students, had duty to protect students from reasonably foreseeable dangers, including other students known to be dangerous).

On the other hand, tort claims against a governmental entity have been dismissed on a number of occasions because no special duty was owed to the plaintiff. In *P.W. v. Kansas Dept. of SRS*, 255 Kan. 827, 877 P.2d 430 (1994), for example, the Kansas Supreme Court held that state regulatory agencies did not owe a special duty to children in state-licensed daycare centers to protect them from abuse. 255 Kan. at 833-34. Likewise, SRS and its agents also owed no special duty to allegedly abused children or alleged child abusers to avoid negligence in investigation of allegations of child abuse. See *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d at 398 (no special duty owed to man accused of child abuse); *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 496, 921 P.2d 216 (1996) (no special duty owed to allegedly abused child to protect him from the alleged abuser).

Similarly, the public duty doctrine applies to policing functions as well. For example, in *Robertson v. City of Topeka*, 231 Kan. 358, 363, 644 P.2d 458 (1982), the court held that a law enforcement officer owed no special duty to a homeowner when the officer refused to remove a trespasser from the premises.

In this case, appellants seem to be arguing the PFA order imposed a specific duty on the City to protect Kathryn from her husband. Appellants cite the language of the order requiring law enforcement to provide assistance, as well as the police department's policies, to support this contention.

While the existence of the PFA order indicates there were problems of violence between Kathryn and Roland, the order clearly does not put either of them within the control of the police de-

partment sufficient to create an individualized duty of care. Absent a special relationship, there is no duty to control the conduct of a third party to prevent harm to others. *Schmidt v. HTG, Inc.*, 265 Kan. 372, Syl. ¶ 4, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998).

In this case, the facts do not fall within any of the cases discussed above that recognize special relationships creating a duty. Moreover, in light of the *Schmidt* case, finding such a special relationship under the present facts is unjustified. In *Schmidt*, the Supreme Court held a special relationship did not exist between a parolee and his parole officer to create a duty on the parole officer to warn others about the parolee's status or propensities. 265 Kan. at 387-90. If a special relationship did not exist in *Schmidt*, it clearly could not exist in this case.

A special duty to an individual also can be created when the governmental entity performs an affirmative act that causes injury or where it made a specific promise or representation that under the circumstances creates a justifiable reliance on the part of the person injured. *P.W. v. Kansas Dept. of SRS*, 255 Kan. at 835-37. Appellants contend Kathryn relied on the government's affirmative acts promising protection.

Appellants' contentions are not supported by the facts or the law. The only citation to the record to support Kathryn's alleged reliance is the deposition testimony of Stewart, who testified that Kathryn understood after the PFA hearing that a police officer would be present when Roland came to the house. Nothing in the transcript from that hearing indicates that any governmental official (and certainly not an agent of the City) told Kathryn that police would be present during the periods her husband was allowed to be in the house. Likewise, there is no evidence that Kathryn was aware of, or relied upon, any of the police department policies regarding domestic abuse cases or civil standbys.

Moreover, even if a promise was made at the courthouse at the time of the PFA hearing, the record shows Kathryn was advised that afternoon, by both a police dispatcher and a police sergeant, that police officers could not be provided for any extended period when Roland was allowed, by court order, to be in the house. The only "promise" made was that the department would send over a

couple of officers, if they were available, to Kathryn's home if she called them right before or when Roland arrived; she was told these officers would stay for a brief period, presumably to make a point to Roland that the police were concerned. There was no evidence that Kathryn called the department when Roland arrived on the evening of September 18 or the next day, when the shootings occurred.

Finally, appellants rely on the PFA order's language which required all "[l]aw enforcement officers" to "grant any assistance necessary to protect the plaintiff . . . from abuse by the defendant." While the Shawnee Police Department knew of the order, the order did not (and should not be read to) require the department to provide police protection 24 hours a day, 7 days a week, nor to be guarantors of Kathryn's safety. The court specifically allowed Roland to be in the house on September 18 or 19, but made no specific order requiring police to be present. From the transcript of the PFA hearing, while it is clear that the court believed it would be a good idea if a third person were present, the order did not expressly or impliedly require the City to provide constant police presence during this period.

For these reasons, the trial court correctly found the City did not owe an individualized duty to Kathryn under the facts of this case. The PFA order did not create the type of obligation appellants seek to impose on the City in this case. Moreover, there is no evidence the City made any promise of constant protection on which Kathryn relied. Finally, there is no special relationship between the City and either Roland or Kathryn other than the same duty police owe to members of the public in general. Absent a basis for an individualized duty to Kathryn, the appellants' claim fails as a matter of law.

## DISCRETIONARY FUNCTION EXCEPTION OF THE KANSAS TORT CLAIMS ACT

Even if the PFA order created some duty the City owed in protecting Kathryn, the question remains whether any of the exceptions of the KTCA apply to give immunity to the City in this case. The trial court found the discretionary function exception, K.S.A.

1999 Supp. 75-6104(e), applied to grant immunity to the City. In their brief, appellants contend the mandatory policies of the police department in handling domestic abuse cases took away any discretion department officials had in handling Kathryn's situation. Again, appellants do not expressly state what they believe these policies required the City to do in this case.

Appellants cite to various cases, which assert the discretionary function exception does not apply when a legal duty to act exists by case law or by statute. However, appellants do not cite any statute or case law that imposes a legal duty on the City in this context. Appellants' conclusory reliance on the PFA order is to no avail because the order did not specify how law enforcement officers were to act in providing assistance, in protecting Kathryn or in enforcing the order. Absent a statutory or legal directive to perform a specified act, the cases cited by appellants have no relevance to the issues in this case.

Appellants also argue the department had no discretion under its own policies, therefore, appellants contend the discretionary function exception could not apply. While this might have been true prior to 1987, it is no longer the case.

In *Fudge v. City of Kansas City*, the Supreme Court held that written guidelines of a police department created a duty that required a police officer to arrest an intoxicated individual who subsequently injured the plaintiff. In *Fudge*, the existence of the written guidelines converted an otherwise discretionary act into a nondiscretionary one. 239 Kan. at 375.

In response to *Fudge*, the 1987 Legislature amended the KTCA to add what is now K.S.A. 1999 Supp. 75-6104(d). L. 1987, ch. 353, § 3. This provision states that a governmental entity is not liable for damages resulting from the "adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured." K.S.A. 1999 Supp. 75-6104(d). This subsection was added in response to *Fudge* and has been acknowledged as legislatively overruling this portion of the *Fudge* decision. *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. at 628-29 (governmental agencies are immune

from claims that they failed to follow their own mandatory policies in placing juvenile offenders). See also *Burney v. Kansas Dept of SRS*, 23 Kan. App. 2d 394; *Beebe v. Fraktman*, 22 Kan. App. 2d 493 (agencies immune for failing to follow their own policies in investigating allegations of child abuse).

It should be noted that some of the Supreme Courts' pronouncements in this area are inconsistent and no effort has been made by that court to reconcile these cases. For example, in *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 819 P.2d 587 (1991), the court held school district personnel's failure to follow mandatory district policies requiring reporting problems with school bus drivers precluded a claim to discretionary immunity from damages arising from assault by driver against student. 249 Kan. at 366. Likewise, in *P.W. v. Kansas Dept of SRS*, 255 Kan. 827, 877 P.2d 430 (1994), the court discussed, in dictum, the *Fudge* holding that mandatory policies created a duty to act despite the enactment of K.S.A. 75-6104(d) several years earlier. 255 Kan. at 836-37. Neither case mentioned 75-6104(d). However, since *Jarboe* is the most recent pronouncement of the Supreme Court on this point and it expressly acknowledges the effect of subsection (d), *Jarboe* controls.

The trial court correctly decided that in the absence of explicit directives in the PFA order, the City and its police department had discretion in determining the proper method of enforcing the PFA order, especially since the order permitted Roland to be on the premises at the time this shooting occurred.

The decision of the trial court is affirmed.