176 P.3d 988 (2008)
Tamara (Tammy) POTTS and James A. Wilson, Jr., Heirs of Law of Ella Alene Wilson, deceased, and Ella Alene Wilson, Deceased, by and through Tamara Potts, Special Administrator of the Estate of Ella Alene Wilson, Appellants,
v.
The BOARD OF COUNTY COMMISSIONERS OF LEAVENWORTH COUNTY, Kansas, Karl Hendry, and Michael Baxter, Appellees.
No. 97,828.
Court of Appeals of Kansas.
February 22, 2008.
*990 Michael Crow, of Crow, Clothier & Associates, of Leavenworth, for appellants.
J. Steven Pigg and Teresa L. Watson, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for appellees.
Before BUSER, P.J., GREEN and CAPLINGER, JJ.
CAPLINGER, J.
Plaintiffs, Tamara Potts (Potts) and James. Wilson (James), as heirs at law, and Potts, as special administrator of the Estate of Ella Alene Wilson, deceased (Alene), appeal the district court's order granting summary judgment to the defendants, the Board of County Commissioners of Leavenworth County (Leavenworth County), and Leavenworth County emergency medical technicians (EMTs), Karl Hendry (Hendry), and Michael Baxter (Baxter) on plaintiffs' state law tort claims of negligence and wrongful death, as well as their claim under 42 U.S.C. § 1983 (2000).
This action resulted after Alene fell in her home and was injured but refused to be transported to a hospital by Leavenworth County EMTs. Alene eventually was transported to the hospital but died at home some 2 weeks later as a result of an infection acquired at the hospital. The plaintiffs alleged the defendants were negligent, indirectly causing Alene's death, when they refused to transport Alene to the hospital, against her wishes and in violation of a durable power of attorney held by Potts. The plaintiffs also asserted the tort of outrage and claims under 42 U.S.C. § 1983.
In this appeal, the plaintiffs argue the district court erred in granting summary judgment on plaintiffs' state law claims of negligence and wrongful death by two exceptions to liability under the Kansas Tort Claims Act (KTCA), K.S.A.2007 Supp. 75-6104(d) and (e), because written Leavenworth County protocols required the EMTs to find Alene incompetent based upon her response to certain questions asked by the EMTs. Further, the plaintiffs argue the protocols required that the EMTs transport Alene to the hospital against her wishes because Potts', as her mother's attorney-in-fact, " requested that they do so. Finally, plaintiffs argue material issues of fact precluded summary judgment on their 42 U.S.C. § 1983 claim. The plaintiffs do not appeal summary judgment on their outrage claim.
Because we find the EMTs did not owe a special duty of care to Alene independent of written county protocols in place to protect her health and safety, we conclude the district court did not err in finding the defendants were shielded from liability by K.S.A. 2007 Supp. 75-6104(d) for their alleged failure to comply with written county protocols. Further, because Alene was never in the custody of the EMTs and the EMTs did not restrain her in any manner, the district court properly granted summary judgment on the plaintiffs' 42 U.S.C. § 1983 claim.
Factual and procedural background
On the morning of November 23, 2003, Alene, age 68, fell on her kitchen floor and was injured. Alene's son, James Wilson, was at home with her at the time. Upon learning *991 of her mother's fall, Alene's daughter, Tamara Potts, drove to the home, and she and James carried Alene upstairs to her bedroom where they laid her on her bed.
Potts attempted to convince her mother to permit Potts to call an ambulance to take her to the hospital, but Alene refused, saying she did not need to go to the hospital. Nevertheless, Potts contacted 911 and a few minutes later, Josh Magaha and Chuck Magaha, Fairmont Township volunteer first responders, arrived at the residence.
Alene, who was agitated, refused the responders' requests to transport her to the hospital and insisted she did not want to be touched. Alene advised the responders she would not go to the hospital because the last time she was hospitalized, she had to pay $700 for a headache.
Leavenworth County EMTs Hendry and Baxter arrived a few minutes later. Potts advised them that her mother suffered from hallucinations, Alzheimer's, and paranoia and had previously suffered a stroke. Potts also told the EMTs that her mother was not competent and that Potts had a durable power of attorney over her mother giving Potts the right to insist that Alene be transported to a hospital if Alene refused to be transported. Potts attempted to give Hendry a document dated in 1994 and signed by Alene which Potts said would verify her durable power of attorney, but Hendry advised Potts he first needed to see the patient.
Josh and Chuck Magaha left the bedroom when Hendry and Baxter arrived. Alene would not permit Hendry or Baxter to touch her or take her blood pressure, but she did allow Hendry to perform a limited visual examination of her leg which did not detect any obvious shortening or rotation. In his patient care report, Hendry wrote that Alene experienced pain from her left hip and may have suffered a hip fracture, but she was without gross deformity to her leg.
In response to questioning from Hendry and Baxter, Alene advised the EMTs that she had slipped and fallen on the kitchen floor. Alene also correctly stated her name as well as the name of the President of the United States. However, Alene incorrectly stated the year as 2002 and then 2004 before correctly stating the year was 2003.
Baxter attempted to convince Alene to permit the EMTs to take her to a hospital, but Alene continued to refuse, insisting she did not want to be moved from her bed. At some point, Hendry attempted to contact Alene's physician, Dr. Peter Cristiano, but received no response at his office, which was closed that Sunday. Hendry then contacted the emergency room physician at St. Luke's Hospital, who advised Hendry that Alene could not be transported if she refused transport.
Sometime later, someone at the scene contacted the Basehor Police Department. Alene immediately recognized the responding officer, Jason Slaughter, from a prior contact. Alene advised Slaughter she would not go to the hospital because she was charged too much on her previous visit. Hendry requested that Slaughter take Alene into protective custody, but Slaughter refused, stating he did not believe Alene suffered from diminished capacity.
Hendry determined that Alene was alert, focused, and aware of her surroundings and that she understood the possible consequences of her refusal to be transported to the hospital. Accordingly, Hendry concluded that Alene did not appear to be of diminished mental capacity and the EMTs would not transport her to the hospital against her will. Nevertheless, the EMTs remained at Alene's home for approximately 1 hour, attempting to convince Alene to allow them to transport her to the hospital. At the EMTs' request, Alene printed and signed her name on a "Refusal to Transport" form.
The next morning, Potts contacted Dr. Cristiano, who instructed Potts to bring her mother to his clinic. Potts and Wilson carried their mother downstairs and transported her to the clinic in a wheelchair Potts had purchased that morning.
Dr. Cristiano x-rayed and examined Alene, indicating in his records that Alene had fallen in her kitchen, tripped down some stairs, hit the left side of her buttocks, and was in "quite a bit of pain from her left leg, hip and down to her knee." He stated that Alene *992 was able to move the hip socket and/or the hip bone which, though not conclusive, indicated she had not suffered a severe injury. Dr. Cristiano further indicated that Alene did not complain of any numbness or tinglingsigns that would indicate nerve damage. Finally, prior to receiving her x-rays, Dr. Cristiano assessed Alene as having suffered contusions to her left hip and elbow caused by a fall. He did not diagnose Alene as having a fractured hip.
Dr. Cristiano released Alene to return home after prescribing an anti-inflammatory medication and instructing Alene to use ice packs for the next 48 hours and then apply heat. Although Cristiano suggested Alene return to the clinic for a follow-up visit, he did not designate a specific date or time. Dr. Cristiano made no special accommodations to transport Alene from the clinic to her home. Rather, Potts took Alene home using the wheelchair and Potts' van.
Later that afternoon, Dr. Cristiano learned from Alene's x-rays that she had fractured her left hip, and Alene was admitted to the hospital about 5 p.m. Surgery to repair her hip was performed on November 27, 2003. Prior to that time, Alene's surgeon ordered Alene be placed in traction to immobilize her leg, but Alene refused. While hospitalized, Alene also refused to eat and refused oxygen. Alene's condition deteriorated, and she contracted nosocomial pneumonia, a hospital-borne infection.
Alene was discharged from the hospital on December 3, 2003, and sent home to receive hospice care. She died on December 6, 2003. Alene's death certificate identified pneumonia as the immediate cause of death.
After her mother's death, Potts submitted two complaints to the Kansas Board of Emergency Medical Services (KBEMS) requesting that the KBEMS revoke Hendry's and Baxter's licenses and review the protocols of the Leavenworth County EMS. The KBEMS declined to revoke Hendry's and Baxter's licenses, finding no evidence of inadequate patient care due to the EMTs' refusal to transport Alene to the hospital.
Potts and Wilson filed suit on their behalf and on behalf of their mother against the defendants, alleging negligence, wrongful death, outrage, and violation of 42 U.S.C. § 1983. The case was later consolidated with a subsequently filed survival action based upon the same occurrences filed by Potts on behalf of her mother's estate.
The district court granted the defendants' motion for summary judgment on all of the plaintiffs' claims. In reaching its decision, the district court refused to consider several statements of "controverted" fact taken from an affidavit filed by Potts just 1 day prior to the filing of the plaintiffs' response to the summary judgment motion. The court found these facts were either immaterial to the issues raised in the defendants' motion or they were merely Potts' opinions, beliefs, or conjecture. Additionally, the district court found that some of the "facts" in Potts' affidavit contradicted her prior deposition testimony.
The district court concluded that K.S.A. 2007 Supp. 75-6104(d) and (e) of the KTCA shielded the defendants from liability for the plaintiffs' claims of negligence and wrongful death. Further, the court concluded the uncontroverted facts did not support the elements necessary to state either a claim of outrage or a claim under 42 U.S.C. § 1983. The plaintiffs timely appeal the district court's grant of summary judgment on all claims except the claim of outrage, which they have not appealed.
Standard of review
Summary judgment is appropriate when the pleadings, interrogatory answers, admissions on file, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court is required to resolve all facts and inferences which might reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply. *993 Welch v. Via Christi Health Partners, Inc., 281 Kan. 732, 736-37, 133 P.3d 122 (2006).
Did the District Court Err in Finding That K.S.A.2007 Supp. 75-6104(d) and (e) Shielded the Defendants from Liability for Plaintiffs' Claims of Negligence and Wrongful Death?
The plaintiffs first take issue with the district court's conclusion that. K.S.A.2007 Supp. 75-6104(d) and (e) shielded the defendants from liability for negligence and/or wrongful death. The plaintiffs contend that under county protocols in place at the time Hendry and. Baxter responded to the 911 call from Potts, the defendants lacked discretion to conclude that Alene was competent to decline emergency treatment or to refuse Potts' requests to transport Alene to a hospital.
The Kansas Tort Claims Act, K.S.A. 75-6101 et seq., provides that, unless a statutory exception applies, a "governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A.2007 Supp. 75-6103(a). K.S.A. 2007 Supp. 75-6104 list several exceptions to the general rule of governmental liability for tort claims.
"A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:
. . . .
"(d) adoption or enforcement of, or failure to adopt or enforce, any written personnel policy which protects persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured, except that the finder of fact may consider the failure to comply with any written personnel policy in determining the question of negligence;
"(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." (Emphasis added.) K.S.A.2007 Supp. 75-6104.
In this case, the plaintiffs point to Leavenworth County's adoption of EMS Protocols 3800.01 and 3800.02 concerning "Consent and Refusal of Treatment" as evidence that the EMT's were subject to "two very significant, clearly established guidelines" which gave them "no authority to refuse services and no authority to arbitrarily ignore the [durable power of attorney]." Because the EMTs had no discretion under these guidelines, the plaintiffs conclude the district court erred in finding the defendants acted within their discretion and were immune from liability under K.S.A.2007 Supp. 75-6104(d) and (e).
Under the heading "Types of patient refusal," the protocols state:
"A. Determine mentation status: The patient must have the ability to communicate present location, present date, and self-awareness to refuse medical services.
B. Age of Patient: The age of majority in Kansas is 18. Patients under the age of 18 must have a legal guardian present to refuse treatment.
C. Legal Guardianship: Legal guardians have the ability to refuse treatment they believe to be against the wishes of the patient. Power of attorney will be [accepted] as proof of legal guardianship if legally completed and present at the time of the emergency call."
The plaintiffs argue that because Alene did not immediately identify the correct year when asked, the EMTs were required by the protocols to find Alene incompetent to refuse treatment under Section A of the protocols. The plaintiffs further suggest that although Section C refers only to a guardian's "ability to refuse treatment", Potts, as Alene's attorney-in-fact, had the authority under the county's protocols to require the EMTs to transport Alene to the hospital against her will.
Significantly, in the district court, the plaintiffs argued in their response to the defendants' motion for summary judgment that pursuant to Fudge v. City of Kansas *994 City, 239 Kan. 369, 720 P.2d 1093 (1986), the defendants had a "special duty to carry out Leavenworth County EMS policy/procedures when [they] apply to an encountered situation." The plaintiffs suggested that a violation of this special duty occurred when the defendants failed to follow the mandatory protocols set forth above, and that this failure created a fact question for the jury as to the defendants' negligence and whether it caused Alene's death.
In Fudge, the Kansas Supreme Court found that because the police were guided by "mandatory" internal procedures for handling individuals incapacitated by alcohol or drugs, the police owed a special duty to take an intoxicated driver into custody. The court reasoned that when the police failed to follow these procedures, they increased the risk that the intoxicated defendant could cause physical harm to others. Thus, the court concluded the City was subject to liability when the intoxicated driver collided with another vehicle, causing the death of the other driver. 239 Kan. at 373, 720 P.2d 1093.
As the district court noted in its decision granting summary judgment, the Supreme Court's decision in Fudge was legislatively overruled by the enactment of K.S.A. 75-6104(d) in 1987. See Jarboe v. Board of Sedgwick County Comm'rs, 262 Kan. 615, Syl. ¶ 1, 938 P.2d 1293 (1997) ("Fudge can no longer be relied upon as valid precedent to establish liability as a result of a public employee's failure to follow written personnel policies, unless an independent duty of care is owed to the injured party.").
In their appeal brief, the plaintiffs no longer rely upon Fudge, apparently recognizing that it has been legislatively overruled. Nevertheless, the plaintiffs essentially assert the same substantive argument on appeal as made in their summary judgment response, suggesting that because the defendants were subject to "clear guidelines resulting with potential for long term, life threatening consequences," the EMTs had no discretion to refuse to render services to Alene. Further, the plaintiffs claim the EMTs' failure to follow the "minimum guidelines for refusing treatment" created a jury question as to whether the EMTs acted reasonably in refusing to honor the durable power of attorney and transport Alene.
As the district court noted, K.S.2007 Supp. 75-6104(d) was legislatively created to address the Fudge decision. That section provides immunity for government employees who fail to enforce a written personnel policy protecting a person's health or safety unless a duty of care independent of such policy is owed to the specific individual injured.
Ten years after the enactment of 75-6104(d), our Supreme Court in Jarboe, extensively examined the history of the enactment of the exception and explained that the "primary rationale" for its enactment
"appears to be that Fudge, if continued as valid precedent, would encourage all government agencies not to develop any written policies, guidelines, or procedures, as any deficiency or failure to completely abide by these procedures would remove the agency's discretion and result in liability." 262 Kan. at 628, 938 P.2d 1293.
Thus, we conclude K.S.A.2007 Supp. 75-6104(d) provides immunity for the defendants' alleged failure to comply with EMT protocols unless the EMTs owed a duty of care to Alene independent of any policy that might have been in place to protect Alene's health or safety. A resolution of this issue requires some understanding of the public duty doctrine as it applies to the facts of this case.
The public duty doctrine
The public duty doctrine was described in Kirk v. City of Shawnee, 27 Kan.App.2d 946, Syl. ¶ 3, 10 P.3d 27, rev. denied 270 Kan. 898 (2000):
"When a negligence claim is asserted against a governmental agency, the court must consider the so-called `public duty doctrine.' That doctrine establishes the general principle that a governmental agency owes duties to the public at large rather than to individuals. Under this doctrine, the fact the governmental entity owes a legal duty to the public at large does not establish a basis for an individual to claim the agency owed a legal duty to *995 the individual personally. No duty exists unless it is established that the agency owed a special duty to the injured party."
Generally, a special duty may exist between a government agency and an injured person, rendering the public duty doctrine inapplicable to their encounter, when: (1) a special relationship existed between the governmental agency and the wrongdoer (i.e., the wrongdoer was in the State's custody or care); (2) a special relationship existed between the governmental agency and the injured person (i.e., the injured person was in the State's custody or care); or (3) the government agency performed an affirmative act that caused injury or made a specific promise or representation that under the circumstances created a justifiable reliance on the part of the person injured. 27 Kan.App.2d at 950-52, 10 P.3d 27.
The first two situations are not present here. No one in the State's custody or care injured Alene, nor was Alene injured while in the State's custody or care. It is undisputed that Alene did not allow either Hendry or Baxter to touch her, nor did the EMTs attempt to restrain Alene or prevent her movement in any manner. Further, Hendry and Baxter did not prevent Potts or anyone else from contacting other care providers to secure outside care for Alene.
The plaintiffs argue a special relationship existed between Alene and the EMTs because the EMTs performed an affirmative act by responding to the 911 call placed by Potts on behalf of Alene. The plaintiffs reason that by responding to the 911 call, Hendry and Baxter assumed control of the situation and placed Alene in a worse position than that in which they found her. Specifically, the plaintiffs suggest that by failing to transport Alene to the hospital, even against her will, the defendants thereby reduced Alene's chances of surviving hip surgery.
The plaintiffs' suggestion that the EMTs placed Alene in a worse position than that in which they found her is not supported by references to the record, and we need not consider this assertion. See Supreme Court Rule 6.02(d) (2007 Kan. Ct. R. Annot. 37). In any event, we do not agree that by responding to Potts' 911 call, the EMTs performed an affirmative act sufficient to create a special duty to Alene, rendering the public duty doctrine inapplicable.
While we are aware of no Kansas cases directly on point, several analogous situations have arisen in which Kansas courts have routinely found that no special duty existed independent of that already required by law or agency regulation. See, e.g., Fettke v. City of Wichita, 264 Kan. 629, 636-37, 957 P.2d 409 (1998) (City owed no special duty to withhold identity of police officer involved in fatal shooting outside of existing statement in manual requiring it to do so); Woodruff v. City of Ottawa 263 Kan. 557, Syl. ¶ 9, 951 P.2d 953 (1997) (oral instruction from one officer to another to take an intoxicated person into custody did not create a special duty to plaintiffs); Jarboe, 262 Kan. at 629-34, 938 P.2d 1293 (no special duty owed to man shot by an escapee from a residential facility even though SRS and County failed to follow internal policies for placement and supervision of escapee at residential facility); Kirk, 27 Kan.App.2d at 951-53, 10 P.3d 27 (City owed no special duty to wife killed by husband, although wife had applied for and received protection from abuse order and requested police presence at her home; City made no special promise to wife to have constant presence at her home); Beebe v. Fraktman, 22 Kan.App.2d 493, 495-97, 921 P.2d 216 (1996) (SRS owed no special duty to a child to investigate abuse even after agency received two reports that child's father was abusing her and promised to follow-up on at least one of the reports).
Here, even if we assume the EMTs decreased Alene's chances of survival of hip surgery by refusing to transport her against her wishes, the plaintiffs have not established that the EMTs performed an affirmative act creating a special duty to the plaintiffs simply by responding to a 911 call. Nor do the plaintiffs suggest the EMTs made any affirmative representations upon which the plaintiffs relied.
Therefore, we conclude the EMTs did not owe the plaintiffs a special duty of care, and the protection of K.S.A.2007 Supp. 75-6104(d) applied to the EMTs' actions. The *996 district court did not err in finding the defendants were excepted from liability under K.S.A.2007 Supp. 75-6104(d) for plaintiffs' claims of negligence and wrongful death.
Did the District Court Err in Holding that the Uncontroverted Facts Did Not Support the Plaintiffs' 42 U.S.C. § 1983 Claim?
Plaintiffs further argue Hendry and Baxter violated Alene's substantive due process right to emergency medical attention when they refused to transport her to a hospital. Because Hendry's and Baxter's conduct was committed while they were acting under color of state law, the plaintiffs argue the. EMTs, along with Leavenworth County, must be held liable under 42 U.S.C. § 1983 (2000) to Alene's estate.
The Due Process. Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall deprive any person of life, liberty, or property without due process of law. The plaintiffs argue the defendants were "categorically obligated" to provide Alene with emergency medical care, thereby invoking the substantive rather than the procedural component of the Due Process Clause.
The defendants rely upon DeShaney v. Winnebago Cty. of Soc. Servs. Dept., 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), for the proposition that the Due Process Clause limits a State's power to act, but does not guarantee certain minimal levels of safety and security. In DeShaney, the United States Supreme Court held:
"[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. [Citations omitted.] . . . If the Due Process Clause does not, require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." 489 U.S. at 196-97, 109 S.Ct. 998.
However, the Court in DeShaney recognized an exception to the general rule that the State does not have an affirmative duty under the Due Process Clause to provide its citizens with aid necessary to secure life, liberty, or property interests. This exception applies where a State
"by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needse.g., food, clothing, shelter, medical care, and reasonable safetyit transgresses the substantive limits on state action set by the Due Process Clause." 489 U.S. at 200, 109 S.Ct. 998.
Further, the Court held that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." (Emphasis added.) 489 U.S. at 200, 109 S.Ct. 998; see also Johnson by Johnson v. Thompson, 971 F.2d 1487, 1495-96 (10th Cir.1992) (only when a person is taken into State custody will he or she have a constitutional right to adequate medical treatment).
In this case, it is undisputed that Alene was never in the custody of the EMTs. It is also undisputed that the EMTs did not restrain Alene in any manner, nor did they prevent Potts or any other person from securing outside care for Alene.
Under these circumstances, we conclude the district court did not err in finding as a matter of law that the defendants did not deprive Alene of any substantive right under the Due Process Clause. Accordingly, the district court did not err in granting summary judgment on the estate's claim under 42 U.S.C. § 1983.
Did the District Court Err in Refusing to Consider Certain Statements of Fact Contained in Potts' Affidavit?
Finally, the plaintiffs challenge the district court's refusal to consider several additional "controverted" facts asserted in Potts' affidavit. The district court found the statements were either immaterial to the issues raised in the defendants' motion, repeated the defendants' statement of uncontroverted facts, or were merely examples of Potts' opinions, beliefs, *997 or conjecture. Additionally, the district court found that some of the facts taken from Potts' affidavit contradicted her prior deposition testimony.
We agree with the district court's findings regarding Potts' affidavit. We further note that consideration of the statements asserted in Potts' affidavit does not change any aspect of our analysis here; K.S.A.2007 Supp. 75-6104(d) provides immunity to the defendants for the plaintiffs' claims of negligence and wrongful death, and the undisputed facts do not support plaintiffs' 42 U.S.C. § 1983 claim.
Affirmed.