NOT DESIGNATED FOR PUBLICATION

No. 122,628

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEANNINE SMITH and JOURDYN EVERETTE,
*Appellants*,

v.

BARTON & ASSOCIATES, INC. and DAVID D. BARTON JR.,
*Defendants*,

and

SAFEGUARD PROPERTIES MANAGEMENT, LLC,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; WILLIAM P. MAHONEY, judge. Opinion filed January 7, 2022. Affirmed.

*Mark E. Parrish* and *Raymond Salva*, pro hac vice, of Boyd Kenter Thomas & Parrish, LLC, of Independence, Missouri, for appellants.

*Sean P. Edwards*, of Sanders Warren Russell & Scheer LLP, of Overland Park, for appellee Safeguard Properties Management, LLC.

Before HILL, P.J., ATCHESON and WARNER, JJ.

PER CURIAM: Jeannine Smith and Jourdyn Everette appeal the district court's grant of summary judgment in favor of Safeguard Properties Management, a property preservation company. They argue that two claims in their petition—negligence and negligent misrepresentation—should have proceeded to trial because they turned on

1

disputed facts. But the district court found as a matter of law that Safeguard did not owe any legal duty to Smith and Everette, and Smith and Everette have not demonstrated that they reasonably relied on any of Safeguard's representations. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Gene Smith died intestate on October 30, 2015. At the time of his death, Gene owned a home in Wyandotte County, which was subject to a mortgage held by JP Morgan Chase Bank. About two months before Gene's passing, Chase filed a petition to foreclose the mortgage on the property.

Gene had lived at the home with Everette, his grandson. About a year before his death, Gene moved to a nursing home due to his advancing Alzheimer's disease. After Gene and Everette left the house, Gene's wife lived there with her children, but they moved out of the home sometime in 2015.

Chase hired Safeguard, a property preservation and inspection contractor, to check on the occupancy of Gene's property every month and to secure the house if it was vacant. Safeguard assigned its work to independent contractors in the area, and they reported the occupancy status of the property from March 2013 until December 2016.

Safeguard reported that the house was occupied continuously from March 2013 until October 2015. Chase did not request any additional work during this time. But when Safeguard reported that the home was unoccupied and that the gas had been shut off in November 2015, Chase asked Safeguard to winterize the property.

In December 2015, Safeguard's independent contractor entered the property and performed various winterization services. The contractor Safeguard hired noted there was mold growing inside the house. After this discovery was reported to Chase, Safeguard

2

performed cleaning to remediate the mold. Safeguard then resumed its monthly inspections. In late August 2016, Safeguard again found mold and, at Chase's request, performed additional cleaning in September 2016.

Throughout these inspections, Safeguard maintained a check-in sheet to record the overall condition of the property and a list of the people who entered the house. Safeguard's check-in sheet continually noted that the house was in "Fair" condition.

As Chase proceeded with foreclosure proceedings in the months following Gene's death, Smith—Gene's daughter and Everette's mother—obtained an order from the Wyandotte County District Court extending the time for her to redeem the property. The court entered a Decree of Descent on October 30, 2016, which transferred ownership of the property to Smith. She then quit-claimed the property to herself and Everette.

In order to redeem the property, Smith executed a $64,000 mortgage with a different lender, First Federal Savings and Loan. Smith had no conversations with First Federal or Chase regarding the condition of the property before she sought the mortgage from First Federal. She was also unaware that the home was being inspected, maintained, and monitored by Safeguard. When Smith was negotiating the note on the mortgage, she had not been to the house since Gene had moved to the nursing home.

In early November 2016, Smith visited the house. She then returned the next day with David Barton, an appraiser hired by First Federal, for an inspection. On that visit, Smith noticed the utilities were shut off and observed stickers around the sinks, toilets, and water heaters, which she believed indicated the house had been winterized. Smith also found the check-in sheet left by Safeguard on the kitchen cabinet, which noted that the house condition was "Fair." Smith did not have any contact with Safeguard or its independent contractors about the check-in sheet, nor did she contact or otherwise speak

3

with anyone from Safeguard about its winterization services, its observations, or the overall condition of the house.

During the walkthrough with Barton, Smith noticed dark spots in the basement. Barton told her it was probably dirt and that she should wipe down the walls and wash the carpets with bleach and water. Barton and Smith saw similar dark spots throughout the bathrooms, in the kitchen, and on several doors. Again, Barton noted that the substance was dirt.

Smith and Everette did not visit the house between this inspection and the closing on the mortgage several weeks later. On December 1, 2016, after the closing, they encountered a Safeguard contractor who had come to remove the lockbox used during monthly inspections. They did not discuss the stickers, the check-in sheet, or any of the services Safeguard performed; instead, their limited conversation only concerned chandeliers and ceiling fans that had been removed from the house.

Safeguard stopped monitoring the house in December 2016. During its time inspecting the house on behalf of Chase, Safeguard's independent contractors did not do any work on behalf of Smith or Everette.

Smith began to attempt to clean and repair the house to make it livable. But when she hired a company to clean the carpets, they refused to run their machines because the black substance all around the house was mold—this was the first time Smith was informed of the house's mold problem. According to Smith, she soon found out that she not only needed to eliminate the mold, but the house also needed to have its pipes, gas, and electricity fixed as well. Smith was able to fix the electricity and have a company work on the mold problem, at the cost of $8,200, but the mold could not be completely removed and still requires extensive work. The mold service Smith hired told her that the mold was likely caused by a leaking roof.

Smith and Everette filed suit against Barton, Barton & Associates (Barton's company), and Safeguard, alleging claims of fraud, fraud by silence, negligence, negligent misrepresentation, and violations of the Kansas Consumer Protection Act (KCPA). Barton filed a motion for summary judgment, arguing Smith and Everette had failed to produce an expert to explain the professional duty owed by an appraiser to support their negligence, negligent misrepresentation, and KCPA claims. Safeguard also filed a motion for summary judgment, arguing it had not made any representations on which Smith and Everette could have reasonably relied. Safeguard also argued that Smith and Everett had not established that it owed them any duty, let alone a duty that had been breached. Smith and Everette dismissed their claims of fraud and fraud by silence against both parties but otherwise opposed the motions for summary judgment on all other claims.

After reviewing the evidence and arguments of the parties, the district court granted summary judgment in favor of the defendants on all claims. Regarding their claims against Safeguard, the district court found:

- Smith and Everette's negligent-misrepresentation claim against Safeguard could not succeed because the plaintiffs had never had any contact with the company, meaning they could not have justifiably relied on the check-in sheet or the winterization stickers.

- Smith and Everette had not provided any support for their argument that Safeguard, which was contracted to work for Chase, owed them a legal duty that could give rise to a negligence claim.

- Smith and Everette had not established the applicable standard of care for a preservation company, and the common-knowledge exception—which negates the

5

need for expert testimony in some negligence cases when a breach is so obvious that it is within the ordinary knowledge and experience of lay persons—did not apply.

The court also granted summary judgment in favor of Barton and his company on all the remaining claims. Smith and Everette appealed.

## DISCUSSION

Though Smith and Everette brought several claims against multiple parties in their petition, those claims have been streamlined significantly since the district court entered its summary-judgment ruling. During the course of this appeal, Smith and Everette have dismissed their claims against the appraiser and his company. They have also abandoned their KCPA claim, leaving only the district court's grant of summary judgment on their negligence and negligent-misrepresentation claims against Safeguard.

As their names suggest, these two claims are related. Negligence is "the lack of ordinary care"—that is, "the failure of a person to do something that a reasonably careful person would do, or the act of a person in doing something that a reasonably careful person would not do, measured by all the circumstances then existing." *Johnston v. Ecord*, 196 Kan. 521, 528, 412 P.2d 990 (1966). A plaintiff asserting a claim for negligence must prove that the defendant had a legal duty to the plaintiff and that the defendant breached this duty, causing the plaintiff to suffer damages. *Nero v. Kansas State University*, 253 Kan. 567, Syl. ¶ 1, 861 P.2d 768 (1993). "The general rule is that '[w]hether a duty exists is a question of law,' while the question as to '[w]hether the duty has been breached is a question of fact.'" *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008) (quoting *Nero*, 253 Kan. 567, Syl. ¶ 1).

6

Negligent misrepresentation addresses a specific instance of negligent conduct—"negligence of knowledge of [a] material fact." *Stechschulte v. Jennings*, 297 Kan. 2, 22, 298 P.3d 1083 (2013). By design, the elements of negligent misrepresentation restrict liability by imposing a legal duty only in limited circumstances: when a defendant supplies information to guide others in business transactions. Thus, liability is confined to those defendants who supplied information to the claimant and intended to influence the claimant's actions with that information. *Rinehart v. Morton Buildings, Inc.*, 297 Kan. 926, 937, 305 P.3d 622 (2013). To prevail on this claim, Smith and Everette would have been required to show:

> "(1) The person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating it; (2) the party receiving the false information reasonably relied on it; and (3) the person relying on the false information is a person or one of a group of persons for whose benefit and guidance the information is supplied or a person or one of a group of persons to whom the person supplying the information knew the information would be communicated by another; and (4) the party receiving the information suffered damages. PIK Civ. 4th 127.43." 297 Kan. at 937.

As with more general negligence claims, many of the elements of negligent misrepresentation turn on factual questions to be resolved by a jury. See *Osterhaus v. Toth*, 291 Kan. 759, 784, 249 P.3d 888 (2011). But the existence of a legal duty and the reasonableness of the plaintiff's reliance on the information alleged are both questions of law for the court. See *Alires v. McGehee*, 277 Kan. 398, 411, 85 P.3d 1191 (2004) (discussing justifiable reliance).

The factual or legal nature of these questions is particularly important in the summary-judgment context. Summary judgment is appropriate when "there is no genuine issue as to any material fact," and "the movant is entitled to judgment as a matter of law." K.S.A. 2020 Supp. 60-256(c)(2). A party seeking summary judgment must show there are no disputed questions of material fact to prevent judgment from being entered—that

there is nothing the fact-finder could decide that would change the outcome. *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). This requires the district court to view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of every reasonable inference drawn from the evidentiary record. 289 Kan. at 900. Because summary judgment is a test of the legal viability of a claim, we apply this same framework on appeal. *Martin v. Naik*, 297 Kan. 241, 246, 300 P.3d 625 (2013).

The district court found that there were two legal deficiencies in Smith and Everette's claims against Safeguard:

1. Safeguard owed no duty to the plaintiffs, and thus they could not prevail on their negligence claim.

2. The plaintiffs could not prevail on their negligent-misrepresentation claim because their asserted reliance on the winterization stickers and check-in sheet was unreasonable.

The district court also provided a third reason for its decision based on the standard of care to be applied against a property preservation company, but we need not reach that rationale because the court's first two reasons control the outcome of this appeal.

In negligence cases, a "duty" is generally defined as "'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" *Schrader v. Great Plains Electric Co-op. Inc.*, 19 Kan. App. 2d 276, 278, 868 P.2d 536 (quoting Prosser and Keeton on Torts § 53, p. 356 [5th ed. 1984]), *rev. denied* 255 Kan. 1003 (1994). Where a duty exists, a person must act as a reasonably prudent person would in similar circumstances. *Manley v. Hallbauer*, 308 Kan. 723, 726, 423 P.3d 480 (2018). Thus, an act is wrongful—or negligent—only if a prudent person

8

would perceive the risk of harm. And this "risk imports [some] relation" between the parties; "it is risk to another or to others within the range of apprehension." *Schrader*, 19 Kan. App. 2d at 278.

As the district court correctly observed in its summary-judgment ruling, there was no relationship between Safeguard and Smith and Everette that would give rise to a legal duty in this sense. Safeguard was hired by Chase, the mortgage company to the previous owner of the home, to report on the condition of the house. Smith and Everette had no ownership interest in the house until the end of October 2016, and the plaintiffs have offered no reason why Safeguard should have known they would eventually own that property. Safeguard performed no work at the plaintiffs' request, nor did any of its representatives have any conversations with the plaintiffs until after they had executed the First Federal mortgage. Under these facts, Safeguard had no duty to contact Smith or Everette to discuss its work on the house.

"If there is no duty, there can be no claim of negligence." *Kirk v. City of Shawnee*, 27 Kan. App. 2d 946, 950, 10 P.3d 27, *rev. denied* 270 Kan. 898 (2000). The district court thus correctly granted judgment in Safeguard's favor on Smith and Everette's negligence claim.

Smith and Everette argue that even if this lack of contact with Safeguard is fatal to their negligence claim, it does not preclude liability for negligent misrepresentation. They attempt to draw comparisons between Safeguard's actions and cases involving fraudulent concealment in business transactions. See *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210 (1987) (medical device manufacturer produced fraudulent promotional material for prospective patients); *Griffith v. Byers Construction Co. of Kansas*, 212 Kan. 65, 510 P.2d 198 (1973) (real estate developers fraudulently concealed defects from a homebuyer to induce a sale). But these cases are distinguishable for at least three reasons.

First, in both *Tetuan* and *Griffith*, the injured claimants were people the defendants intended to reach with their communications—prospective consumers of the medical devices or prospective purchasers of property. As we have indicated, Smith and Everette were not within the scope of people with whom Safeguard was communicating, nor would Safeguard have any reason or obligation to reach out to Smith or Everette to discuss the condition of the house. Accord *Rinehart*, 297 Kan. at 937 (noting the limited scope of negligent-misrepresentation claims).

Second, although neither the medical device manufacturer in *Tetuan* nor the real estate developer in *Griffith* had any direct contact with the injured party, both intended the information they provided—that the medical device was effective and safe or that the homes were defect free—to influence a purchase. But unlike the defendants in *Tetuan* and *Griffith*, Safeguard was not offering services for sale to the general public; it was performing a contracted reporting service with Chase.

And third, even if Smith and Everette were within the scope of people Safeguard's services might affect, their negligent-misrepresentation claim suffers from another legal deficiency: In both *Tetuan* and *Griffith* the plaintiffs had a right to rely on those representations and justifiably did so. But here, the district court found that Smith and Everette's asserted reliance on Safeguard's winterization stickers and check-in sheet was objectively unreasonable. We agree.

Smith and Everette argue that Safeguard intended—or should have at least expected—them to rely on the winterization stickers and the check-in sheet after Safeguard performed work on the house for Chase. But the winterization stickers contained language directly undermining the plaintiffs' assertions: "This procedure is not a guaranty or warranty of any kind with respect to the HVAC, plumbing, or any other mechanical systems at this property." Smith and Everette admit that they did not contact

Safeguard about what types of winterization procedures were performed, or when. In fact, they did not contact Safeguard at all to inquire as to any work done at the house.

Perhaps recognizing this deficiency, Smith and Everette's arguments on appeal focus on the multiple notations of the Safeguard contractors on the check-in sheet that the house was in "Fair" condition. They emphasize that these notations were made even after Safeguard reported mold on the property to Chase and suggested remediation. But Smith and Everette admit that they never contacted Safeguard, or even Chase, for clarification as to what "Fair" intended to convey. Nor did they inquire about the nature of Safeguard's work or inspections.

The undisputed evidence showed that Safeguard left a one-word description of the property on a check-in sheet and that Smith and Everette saw this description in the month before they closed on their First Federal mortgage. They took no action to ascertain the meaning of the notations or otherwise obtain Safeguard's reports or learn what services the company had performed. Assuming Smith and Everette relied on the check-in sheet at all, we agree with the district court that their asserted reliance—standing alone—was not reasonable. The court therefore properly entered judgment in favor of Safeguard on the plaintiffs' claim of negligent misrepresentation.

Affirmed.