NOT DESIGNATED FOR PUBLICATION

No. 112,469

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TRACY ULLERY, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF JAMIE ULLERY,
and KRISTOPHER ULLERY,
*Plaintiffs/Appellants*,

v.

DARREN OTHICK, WINDSOR PLACE AT-HOME CARE, L.L.C.,
HEALTH MANAGEMENT OF KANSAS, INC., JOANN J. O'BRIEN,
*Defendants/Appellees*,
ALICE BEATTY,
*Defendant/Cross-claimant/Appellee*,
and
MONTE COFFMAN,
*Defendant/Appellee.*

MEGHAN OTHICK, et al.,
*Plaintiffs*,

v.

JOANN J. O'BRIEN, et al.,
*Defendants.*

MEMORANDUM OPINION

Appeal from Douglas District Court; ROBERT W. FAIRCHILD, judge. Opinion on remand filed
September 1, 2017. Affirmed.

*Linus L. Baker*, of Stilwell, for appellants.

*M. Bradley Watson and Jeff K. Brown*, of Logan Logan & Watson, L.C., of Prairie Village, for
defendants/appellees Windsor Place At-Home Care, L.L.C., and Monte Coffman.

*James P. Nordstrom and Samuel A. Green,* of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, for defendant/cross-claimant/appellee Alice Beatty.

*Bradley S. Russell and Tyler C. Hibler,* of Sanders Warren & Russell, LLP, of Overland Park, for defendant/appellee Joann O'Brien.

Before LEBEN, P.J., GARDNER, J., and WALKER, S.J.

LEBEN, J.: Parties on both sides appeal from the district court's summary-judgment rulings in this case, which arose out of a fatality auto accident. Jamie Ullery died as a result of the crash; she was a passenger in a car driven by her mother, Joann O'Brien. Alice Beatty was also in the car, and she and Joann were part-time caregivers for Jamie, who had significant physical disabilities.

Jamie's son, Kristopher, and her estate filed a lawsuit for damages for Jamie's death and for suffering they said she experienced from the accident. What's unusual about the lawsuit—and what this appeal mostly focuses upon—is who has been sued and on what basis, if any, they might be liable. Kristopher and the estate sued not only the drivers of both vehicles but also Alice, a back-seat passenger, and Windsor Place At-Home, L.L.C., a company that managed a public-assistance program under which Joann and Alice were paid to provide part-time care for Jamie.

The district court granted summary judgment on some issues and denied it on others. In this appeal:
- Kristopher and Jamie's estate challenge the district court's grant of summary judgment to Windsor Place, but we agree with the district court that Joann and Alice were not employees of Windsor Place. So there is no basis for imputing any liability they might have to Windsor Place as their employer. And there was no

evidence to establish that Windsor Place had some separate duty to investigate Joann's health or driving record.

- Kristopher and Jamie's estate also challenge the district court's grant of summary judgment on any claim for any preimpact emotional distress that Jamie may have suffered. We agree with the district court that there is too little evidence of Jamie's awareness of the impending accident for such a claim to proceed, a point made clear by the Kansas Supreme Court's decision in *St. Clair v. Denny*, 245 Kan. 414, 781 P.2d 1043 (1989). In *St. Clair*, the court held that 60 feet of swerve marks by the deceased driver weren't sufficient evidence to present a preimpact claim of emotional distress, and the evidence here is no greater.

- Joann appeals the district court's denial of her motion for summary judgment against claims for Jamie's conscious pain and suffering after the accident. Although there is no expert testimony supporting these claims, Kansas courts have upheld jury awards for pain and suffering based on lay witness testimony that an injured person squeezed a family member's fingers in response to statements, *Fudge v. City of Kansas City*, 239 Kan. 369, 720 P.2d 1093 (1986), and there's similar evidence here—Kristopher and his aunt testified that Jamie squeezed their hands at least twice when they were talking to her.

- Kristopher and Jamie's estate sought to raise an additional appellate issue in their reply brief on appeal—that the district court should not have granted summary judgment in Alice's favor. But a reply brief is not an appropriate mechanism for raising an issue on appeal. See *State v. McCullough*, 293 Kan. 970, 984, 270 P.3d 1142 (2012). And even if we were to reach the issue, Kristopher and Jamie's estate have not cited evidence that would have created some duty benefitting Jamie on Alice, the back-seat passenger, to stop Joann from driving on the day of the accident.

With that overview, we proceed to review the case in greater detail.

3

With Joann driving and Jamie and Alice as passengers, Joann's car drifted across the center line into oncoming traffic, colliding with a truck driven by Darren Othick. (He's a defendant in the underlying lawsuit—and thus listed in the caption of this case at the top of our opinion—but no issues in this appeal relate to him.) Jamie died 15 days later at an area hospital. Joann and Alice survived.

Many of the issues before us relate to the arrangements under which Joann and Alice served as part-time caregivers for Jamie. Jamie participated in a public-assistance medical-care program administered by the State of Kansas and paid for with federal and state funds. Jamie received up to 30.5 hours of services per week through this program, which provided help like personal care, assistance walking, meal preparation, shopping, money management, and housekeeping. Under this program, Jamie hired Joann and Alice as support workers who would help Jamie with tasks of daily living.

Alice was Jamie's primary caregiver, working about 28 hours per week. She prepared most of Jamie's meals, bathed her, helped her dress, cleaned the house, and did laundry. Alice never provided transportation for Jamie.

What Joann's caretaking role was under this program isn't clear from our record. Joann and others testified that Joann drove Jamie to doctors' appointments and took her shopping. The care plan approved by state workers included helping Jamie with shopping. But the approved care plan didn't cover transportation, which was to be provided by family members without compensation.

The state-assistance program also included the provision of a "Financial Management Service provider" that would provide administrative and human-resources services like payroll and record-keeping. Jamie chose Windsor Place to handle those

4

duties, and she signed a form contract with Windsor Place. The State paid Windsor Place $115 per month to provide these services.

Jamie's contract with Windsor Place provided that she would "act as the employer" for direct-support workers like Joann and Alice; Jamie was responsible for selecting, managing, scheduling, training, and supervising them. She authorized Windsor Place to bill the state Medicaid program on her behalf, process the direct-support workers' timesheets, calculate tax withholdings, and issue paychecks to the workers.

Jamie entered into a separate "Employment Service Agreement" with both Joann and Alice. In it, Joann and Alice agreed to the state-mandated pay rates, agreed to file weekly timesheets, and agreed to comply with any instructions of the financial-management services provider about billing for services.

That agreement—to comply with Windsor Place's instructions about billing for services—led to the trip on which Jamie suffered her fatal injuries. Windsor Place sent letters to Joann and Alice advising that the State was implementing a new timekeeping system and requiring that Joann and Alice attend a one-hour training program. Windsor Place agreed to pay direct-support workers for the hour spent at the training.

Joann agreed to drive and picked up Alice. Jamie decided to go with them, even though Joann told Jamie that she didn't need to attend the training session. They stopped on the way at a chiropractic office; Joanne (and perhaps also Jamie) received some treatment there. Joann then drove the three women to the training session.

After the training, the women stopped at a fast-food restaurant where Joann ran into a relative, Dennis Garrison. Dennis told Joann that she didn't look well and that she ought to have Alice drive home, but that conversation didn't include Alice. After eating,

5

the three women headed home, about 30 miles away—with Joann still driving, Jamie in the front passenger seat, and Alice in the back seat.

At about 1 p.m., Joann's car drifted over the center line of a highway and into oncoming traffic, crashing into Darren Othick's truck. Alice said later that she saw Joann's head slump forward right before the crash, which led her to call out Joann's name twice. Joann said that Alice's second yell woke her up and she hit the brakes. Alice said she wasn't aware of Joann ever having blacked out before and said nothing she'd seen that day suggested to her that Joann shouldn't have been driving.

Jamie was taken to an area hospital by helicopter. She died there 15 days later.

Eventually, her estate and her son filed suit against several parties: Joann, Alice, Windsor Place, and some other parties related to Windsor Place. After extensive development of the evidence, the parties presented several issues to the district court on summary-judgment motions. In its ruling, the district court eliminated several issues from the case:

- The court granted summary judgment in favor of Windsor Place and its related parties, concluding that there were no viable claims against them.
- The court granted Joann's motion for partial summary judgment against any claim that Jamie suffered emotional distress in the moments immediately before the collision.
- The court denied Joann's motion for partial summary judgment against any claim that Jamie suffered conscious pain and suffering after the collision.
- The court granted Alice's motion for summary judgment, concluding that Alice had no special duty to protect Jamie from riding with Joann and no knowledge that Joann might not be in good enough condition to drive.

6

Although appeals normally don't take place until a case has concluded—and these rulings only eliminated some issues, with others remaining for trial—the district court concluded that these rulings should be certified as final judgments so that an appeal could be taken. Our court initially dismissed the appeal, but the Kansas Supreme Court determined that the appeal was properly before us. *Ullery v. Othick*, 304 Kan. 405, 372 P.3d 1135 (2016).

Because the issues on appeal were decided on summary-judgment motions, we apply the same standard the district court applies. *St. Catherine Hospital v. Alvarez*, 53 Kan. App. 2d 125, 127, 383 P.3d 184 (2016). Under that standard, summary judgment is appropriate only when the motion and evidence presented show that there is no genuine issue as to any significant fact and the moving party is entitled to judgment as a matter of law. *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

ANALYSIS

On appeal, Kristopher and Jamie's estate have organized their arguments into a number of subtopics (like "Jamie Was Not Trespassing in O'Brien's Van") rather than around the specific rulings being appealed. We will organize our discussion around those rulings. In this section, for ease of discussion about the legal arguments made by Kristopher and Jamie's estate, we will refer to them collectively as the plaintiffs (the parties who brought this lawsuit). We will include additional factual background as needed to discuss each of the legal issues.

I. *The District Court Properly Granted Summary Judgment to Windsor Place and Related Parties.*

Often the best way to consider a legal argument is to leave the law part out and just think about what the claim is. Here, the plaintiffs want Windsor Place to be liable for injuries Jamie suffered when she was a passenger in a car driven by her mother. Plaintiffs want Windsor Place to be liable because it paid Joann $9.70 (take-home pay, $8.15) for one hour of time that Joann spent that day at a training session, a session to which Jamie was neither invited nor needed. And the fatal car accident didn't occur *at* the training session for which Joann was paid; it took place on the way home—and Joann and Jamie didn't go directly home after the meeting; they stopped first for lunch.

From the vantage point of a person not trained in the law, there seems to be no connection between anything Windsor Place did and Joann's veering across the center line of a highway, running into Darren Othick's truck, and causing Jamie's death. And in our view, the district court correctly held that no intricate legal analysis shifts the vantage point so far that Windsor Place could somehow be legally liable here.

The plaintiffs' primary legal argument is that Joann was Windsor Place's employee. An employer may be held liable for injuries caused by the negligence of an employee if the employee was acting within the scope of employment. See *Sanchez v. U.S.D. 469*, 50 Kan. App. 2d 1185, 1194-95, 339 P.3d 399 (2014). But the district court found that Joann was an independent contractor, not an employee of Windsor Place, and a party generally is not liable for the negligence of independent contractors working for it. See *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 261, 891 P.2d 435 (1995); Restatement (Second) of Torts § 411. So the initial question to be determined on this argument is whether Joann was an employee of Windsor Place.

All the parties agree that Joann was an employee of Jamie, but the plaintiffs argue that Windsor Place was a coemployer of Joann. Generally, there's an employer-employee relationship when the employer has the right to control the manner in which an employee's work is done as well as the result. And the relationship is that of an

8

independent contractor, not an employee, if the person performing the work can do so according to his or her own methods, without being subject to the control of the employer except as to the results or the product of the work. *Craig v. FedEx Ground Package System, Inc.*, 300 Kan. 788, 812, 335 P.3d 66 (2014).

There are more detailed, multi-factor tests that can be applied when determining whether someone is an employee or an independent contractor. In *Craig*, for example, the Kansas Supreme Court identified 20 factors to consider when determining whether a person is an employee for purposes of the Kansas Wage Payment Act. 300 Kan. at 797-98. The 20-factor test set out there was designed to combine a traditional right-to-control test with another test often called the economic-reality test. The economic-reality test adds to the consideration factors such as the worker's opportunity for profit or loss, the amount of the worker's investment, and the extent to which the work is an integral part of the employer's business. But the primary focus remains on the employer's right to control how the work is done. 300 Kan. at 796-98.

We do not see a need to expand this opinion by discussing all 20 of the *Craig* factors. A look at the big-picture items suffices to safely conclude that Joann was not a Windsor Place employee:

- Under the terms of her contract with Windsor Place, Jamie was to "act as employer" for her support workers and was responsible for hiring, managing, training, and supervising them. Under the terms of Jamie's contract with the direct-service workers, the workers agreed that Jamie would "determine[] work hours/schedules, tasks . . . , work conditions and all rules in the home that [the direct-support workers] must comply with."
- The contract between Jamie and Windsor Place provided specific administrative duties for Windsor Place to perform, like processing payroll checks and taxes, maintaining records, and conducting criminal background checks—but did not provide any right for Windsor Place to control the day-to-day work of the direct-

9

support workers. In fact, Windsor Place agreed in writing to "[e]nsure client [Jamie] not [Windsor Place], has right to choose, direct and control the services and [the direct-support workers] who provide them without excessive restrictions or barriers."

In our view, whether Joann was an employee of Windsor Place wasn't a close call, and the district court properly granted summary judgment on that issue. See *McCubbin v. Walker*, 256 Kan. 276, 281, 886 P.2d 790 (1994).

The plaintiffs argue that even if Joann wasn't a Windsor Place employee while she was performing her normal work for Jamie, she became a Windsor Place employee on the date of the accident by attending a required training session. Once again, if we step back and look at this claim initially without extended legal analysis, it's quite far-fetched. Windsor Place paid Joann less than $10 to attend a one-hour training session; they didn't pay her for either her time or costs of getting to the session. They also didn't invite Jamie to attend the session. Yet somehow the plaintiffs claim that Joann became a Windsor Place employee at least for that day—and acted within the scope of her employment when she had Jamie as a passenger in her car on the way home from the meeting.

Once again, adding some legal analysis does not improve the plaintiffs' case. Plaintiffs argue that Windsor Place exercised control over Joann when it made the training session mandatory. But Windsor Place's notice told Joann and others in her position why the meeting was required—if they didn't attend, they wouldn't know how to use the state's new system for reporting their hours worked. And if that time didn't get into the state's payroll system, they wouldn't be paid. By sending that notice and making training on the new system mandatory, Windsor Place helped both the direct-support workers and Windsor Place to have a smooth transition to the new system. But Windsor Place did not gain control over the services Joann would provide to Jamie by having that meeting.

10

Moreover, even if Joann *were* considered a Windsor Place employee for the day of the meeting, that wouldn't change the result under Kansas law. We already noted that an employer is responsible for the employee's negligence only when the employee is acting within the scope of the employment. As a general rule, an employer is not liable under Kansas law for an employee's negligence while the employee is traveling to or from the job. That's known as the "coming and going" rule—and it makes sense because the employee isn't acting within the scope of employment while coming to or going away from the jobsite. See *Girard v. Trade Professionals, Inc.*, 50 F. Supp. 2d 1050, 1052 (D. Kan. 1999). There's a limited exception when the employer controls the employee while traveling, such as when an employee is being paid and traveling between two worksites when an accident occurs. See, e.g., *Mulroy v. Olberding*, 29 Kan. App. 2d 757, 767-68, 30 P.3d 1050 (2001). But in our case, there's no evidence that Windsor Place had any right to control Joann's actions in coming to or going from the training session. In fact, she was obviously free to go anywhere she wanted after the meeting: she headed to a fast-food restaurant, not anyplace Windsor Place had directed her to go. So even if Joann had been a Windsor Place employee, Windsor Place would not have been responsible for her negligence while driving her car after the training session.

What we've discussed so far—that Joann wasn't a Windsor Place employee and Windsor Place in any event wouldn't have had liability for her negligence when she drove home from a work meeting—eliminates most of the claims the plaintiffs have made against Windsor Place and the parties related to it. (We aren't addressing the related parties separately because if there's no liability for Windsor Place, there's no liability for them, either.) The plaintiffs have also made two other attempts to fit a legal theory to their claim against Windsor Place: (1) that Windsor Place violated a fiduciary duty it owed to Jamie by failing to investigate Joann's health and driving history; and (2) that Windsor Place breached a contractual duty to Jamie by failing to investigate Joann's medical history and failing to make sure that Jamie had proper control and oversight of

11

her direct-support workers. These legal theories do not support a claim against Windsor Place here, either.

Let's start with the breach-of-fiduciary-duty claim. A fiduciary relationship exists when one party places special confidence in another, who is then bound to act in good faith and with due regard for the other's interests. *Dana v. Heartland Management Co., Inc.*, 48 Kan. App. 2d 1048, 1067, 301 P.3d 772 (2013). Fiduciary relationships may either be (1) created by contract or legal proceeding or (2) implied by law due to the nature of the situation and the relationship of the parties. *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235 (1982). But one party can't just unilaterally impose fiduciary duties on another; such duties must be consciously undertaken and agreed to. *Dana*, 48 Kan. App. 2d at 1067.

Windsor Place did agree contractually to perform various administrative tasks for Jamie. But nothing in its written agreement with Jamie committed Windsor Place to investigating any direct-support worker's health or driving history. While Windsor Place did ask for some health information in the form employment application it used, that doesn't show that Windsor Place undertook a duty to Jamie to investigate Joann's health or driving history. Nor does anything in our record suggest that Windsor Place somehow had superior knowledge about the health or driving ability of Joann, Jamie's own mother, so as to have an implied fiduciary duty to Jamie to investigate those matters.

The plaintiffs characterize Jamie as "an adult victim incapable of caring for herself and [] dependent on [Joann, Alice], and Windsor [Place] . . . ." But Jamie lived independently, and this state-assistance program provided only 30.5 hours of assistance per week. Windsor Place did not assume a fiduciary duty to ensure Jamie's physical well-being. Nor did it undertake a duty to check on Joann's ability to drive her daughter from place to place.

12

The plaintiffs' attempt to restate their claim as a breach-of-contract claim doesn't work, either. Plaintiffs devote only a single paragraph, near the end of their brief, to this claim, making a vague assertion that Windsor Place violated contractual provisions on things like training Jamie to recognize and report critical events, failing to help Jamie to ensure that she understood the responsibilities involved with directing her own services, and failing to make sure that Jamie properly supervised her direct-support workers. The plaintiffs have not pointed to a specific contractual provision related to their claims in this lawsuit that was breached by Windsor Place. Nor have they pointed to a contractual requirement that Windsor Place do any investigation of Joann's driving abilities.

II.  *The District Court Properly Granted Partial Summary Judgment Precluding from Trial Any Damages Claim Regarding PreImpact Emotional Distress.*

Since Joann was driving a car that went across a highway center line and collided with another vehicle, some claims against her would necessarily remain for trial. She filed a motion for partial summary judgment seeking to narrow the issues for trial. Specifically, she filed a motion to preclude any claim for damages based on emotional distress that Jamie may have experienced in the moments immediately before the crash. The district court granted that motion on the basis that the evidence wasn't sufficient to show that Jamie had actually experienced emotional distress before the crash. The plaintiffs have appealed that ruling, arguing that there's sufficient evidence to support the claim.

So how much evidence of preimpact emotional distress is required to present such a claim in court? For that question, we must look at a key Kansas Supreme Court case, *St. Clair v. Denny*, 245 Kan. 414, 781 P.2d 1043 (1989). In it, the court noted that one of its former members—then a federal trial judge—had suggested that the Kansas Supreme Court would ultimately conclude that a claim for preimpact emotional-distress damages should not be allowed for merely negligent conduct. But rather than reach that issue, the

13

court simply found the evidence in the *St. Clair* case was insufficient to support a factual claim that the person who had died had suffered emotional distress before the auto accident that killed her.

In *St. Clair*, there were 60 feet of skid marks caused when one of the drivers turned the front tires of her automobile away from the impending accident. While that showed awareness of a likely accident—and an attempt to avoid it—it didn't provide sufficient evidence that the driver had experienced emotional distress, the court concluded, so her estate could not pursue a claim for preimpact emotional-distress damages. 245 Kan. at 424.

The evidence in support of the plaintiffs' claim here is not as strong as the evidence was in *St. Clair*. Here, there is no evidence Jamie was even aware of a possible collision, let alone distressed by it. Neither Joann nor Alice could recall Jamie saying or doing anything in the moments before the crash. Since the evidence was not as strong as that found insufficient in *St. Clair*, the district court correctly granted summary judgment on this issue.

III. *The District Court Properly Denied Joann's Motion for Partial Summary Judgment to Preclude from Trial Any Damages Claim Regarding Conscious Pain and Suffering After the Accident.*

Joann also filed a motion for partial summary judgment that sought to preclude any claim for damages based on Jamie's conscious pain and suffering *after* the crash. The district court denied that motion, and Joann has appealed that ruling.

Under Kansas law, damages are recoverable for pain and suffering only when it is consciously experienced. See, e.g., *Fanning v. Sitton Motor Lines, Inc.*, 695 F. Supp. 2d 1156, 1159 (D. Kan. 2010); *Cochrane v. Schneider Nat. Carriers, Inc.*, 968 F. Supp. 613,

14

617 (D. Kan. 1997); *Gregory v. Carey*, 246 Kan. 504, 509, 791 P.2d 1329 (1990); *Leiker v. Gafford*, 245 Kan. 325, 342, 778 P.2d 823 (1989). This means that a plaintiff has the burden to establish that the injured person was in fact conscious and experiencing pain. See *St. Clair*, 245 Kan. at 422; see also *Cochrane*, 968 F. Supp. at 617. At the summary-judgment stage, the evidence is taken in the light most favorable to the nonmoving party (here, the plaintiff) since we're merely testing whether the evidence is sufficient to present a claim to the fact-finder. *Kuxhausen v. Tillman Partners*, 291 Kan. 314, 318, 241 P.3d 75 (2010).

Joann argues that the evidence supporting a claim of postaccident pain and suffering wasn't sufficient for a fact-finder to conclude that Jamie was sufficiently conscious to experience pain and suffering. Joann also argues that some of the information about Jamie in the records of her hospitalization couldn't be understood by a jury without expert testimony—and the plaintiffs hadn't identified an expert witness on this subject before the district court's deadline. Accordingly, only information in the hospital records that is not too complex for a lay person to understand may be used to meet the plaintiffs' burden to show that Jamie consciously experienced pain. See *Schlaikjer v. Kaplan*, 296 Kan. 456, 464, 293 P.3d 155 (2013); *Patterson v. Cloud*, No. 115,360, 2017 WL 947858, at *6 (Kan. App. 2017) (unpublished opinion).

Joann may be right that some of the medical records have information that, though likely relevant, might not be readily understood by a lay person. For example, there are scores derived from the "Glasgow Coma Scale" on some of the records. Expert testimony may well be needed to understand those scores. See, e.g., *People v. Delgado*, 213 Cal. App. 4th 660, 664, 153 Cal. Rptr. 3d 260 (2013). But see *Clements v. United States*, 669 A.2d 1271, 1274-75 (D.C. Ct. App. 1995).

But Kansas courts have held that whether an injured party has experienced conscious pain and suffering may be established either by a lay witness or by expert

15

testimony. See, e.g., *Smith v. Printup*, 254 Kan. 315, 357-58, 866 P.32d 985 (1993); *Gregory*, 246 Kan. at 510; *Leiker*, 245 Kan. at 342-44. "Under Kansas law, the testimony of lay witnesses is admissible on the issue of consciousness." *Folks v. Kansas Power and Light Co.*, 243 Kan. 57, 69, 755 P.2d 1319 (1988), *overruled on other grounds by York v. InTrust Bank, N.A.*, 265 Kan. 271, 962 P.2d 405 (1998).

With that in mind, there is lay testimony and information in the hospital records that a lay person could understand supporting the plaintiffs' claim that Jamie consciously experienced pain after the accident:

- On at least two dates, medical staff reported that Jamie would open her eyes to her name and could follow some commands.
- Jamie's son, Kristopher, and his aunt, Brenda Foster, said they saw Jamie make facial gestures, shed a tear, and squeeze their hands in response to them talking to her.
- One medical record read: "[Patient's] sedation turned off this a.m., [patient] awakens to name and follows commands, [patient] nods head and grimaces when asked if in pain."
- Another read: "[Patient] opens eyes to name and will squeeze with left hand."

This evidence is sufficient to withstand a summary-judgment motion and similar to evidence found sufficient in other cases based entirely, or almost entirely, on lay-witness testimony. In *Folks*, for example, a police officer's testimony that Folks was breathing and making incoherent noises while appearing to be conscious was sufficient evidence to support a jury award for pain-and-suffering damages. 243 Kan. at 69. Likewise, in *Pape v. Kansas Power and Light Co.*, 231 Kan. 441, 448, 647 P.2d 320 (1982), the court found sufficient that the injured person had been moaning while breathing, had squeezed his wife's hand in response to a question, and had been noted in hospital records as responsive to pain stimuli. And in *Fudge v. City of Kansas City*, 239 Kan. 369, 380, 720 P.2d 1093 (1986), the court upheld a jury award based solely on a

family member's testimony that the injured person had squeezed her fingers on a few occasions after the accident in response to statements about his children.

The district court denied summary judgment but did make some comments we disagree with regarding the need for expert testimony. The court noted some of the same statements we have cited from the medical records and concluded that "an expert witness is needed to explain these records." Similarly, the court concluded that the lay testimony of Kristopher and Brenda did not by itself prove that Jamie "experienced pain consciousness or consciously." In support of its finding on these points, the district court cited *State v. McFadden*, 34 Kan. App. 2d 473, 475-76, 122 P.3d 384 (2005). That case does recite the longstanding rule that expert testimony is generally required to present medical matters beyond common knowledge, but it doesn't address what's required to prove consciousness when determining pain and suffering. On that issue, as shown by *Folks*, *Pape*, and *Fudge*, evidence similar to that presented here by the plaintiffs has been allowed, without expert testimony, on the question of consciousness.

Where to draw the line on every potential inference from the testimony and hospital records is not the issue in this appeal; here we simply must decide whether the plaintiffs have enough evidence to avoid summary judgment against a claim for postaccident pain-and-suffering damages. Plaintiffs' evidence is sufficient for that purpose. Accordingly, the district court properly denied summary judgment.

IV. *Plaintiffs Have Not Shown Error in the District Court's Grant of Summary Judgment to Alice.*

The district court granted summary judgment in Alice's favor, concluding that this back-seat passenger did not owe a duty to Jamie on the day of the accident in any way related to Jamie's injuries. In the plaintiffs' initial brief on appeal, they argued that Alice

17

was a Windsor Place employee (along with Joann), but they did not address the district court's conclusion that Alice had owed no duty to Jamie related to the accident.

After plaintiffs filed their main brief on appeal, Alice noted in her responsive brief that the plaintiffs' argument about her had been limited to fairly minor references in the plaintiffs' 52-page opening brief. The plaintiffs included one footnote claiming that references in the brief to Joann should be taken to equally reference Alice: "Because the contracts of O'Brien and Beatty are identical, the appellants refer to O'Brien with the understanding the same arguments apply to Beatty." But that sentence came in the section where plaintiffs were arguing that Joann should have been treated as an employee of Windsor Place so that Windsor Place might have liability; that section of the brief doesn't argue that Alice had some duty owed to her fellow passenger, Jamie, when Joann drove both of them home from the work meeting. The only direct references in the plaintiffs' initial brief to Alice's liability were a few sentences on page 37 that said Alice had been negligent "in taking affirmative actions in helping Jamie to ride with [Joann]," "in failing to perceive [Joann's] poor condition," and "in not heeding the warnings given to her by [Dennis] Garrison." As plaintiffs' counsel conceded at oral argument, there was no evidence that Alice heard Dennis state his concerns. More significantly, there was no argument in the plaintiffs' initial brief about the source of any duty Alice, one passenger in the car, would have had toward Jamie, another passenger.

Alice notes that points "raised only incidentally in a brief but not argued there [are] deemed abandoned," *Cook v. Gillespie*, 285 Kan. 748, Syl. ¶ 6, 176 P.3d 144 (2008). The plaintiffs' footnote reference combined with a few sentences that didn't address the source of Alice's potential duty to Jamie while both were passengers in the same car are merely incidental references that fall well short of the legal argument required to avoid abandonment of an issue.

18

After all, the crux of the district court's ruling about Alice was that—as a back-seat passenger—she had no *duty* to Jamie to check to see whether Joann, Jamie's mother, was in good shape to drive them both home. Plaintiffs' initial brief simply didn't address that question. While the plaintiffs have tried to raise the issue of Alice's duty to Jamie in a reply brief, appellants generally can't raise new issues in a reply brief. *State v. McCullough*, 293 Kan. 970, 984-85, 270 P.3d 1142 (2012). And even in that reply brief, the plaintiffs have simply raised claims that there are some disputed facts without linking those facts to specific legal arguments. So the plaintiffs have abandoned any challenge to the district court's grant of summary judgment to Alice.

Even if they hadn't, the plaintiffs have cited no evidence that would have created a duty on Alice's part to protect Jamie from her mother driving Jamie home that day. Generally, a person (whom we'll call the actor) has no duty to control the conduct of a third person to prevent harm to someone unless there is a special relationship between the actor and that third person or between the actor and the injured person. *D.W. v. Bliss*, 279 Kan. 726, 734-35, 112 P.3d 232 (2005). So here there would have to have been some special relationship between Alice and either Joann or Jamie that somehow would have been relevant to Joann's driving Jamie home.

As between Alice and Jamie, none of the relations that generally lead to recognition of a special relationship—like parent and child, master and servant, persons in custody of another, or persons in charge of someone with a dangerous propensity— were present. See *D.W.*, 279 Kan. at 735. The plaintiffs argued in the district court that the situation was similar to that of a parent and child, but the district court rejected that because, it said, the plaintiffs had "provided no evidence that [Jamie] was, in any sense of the word, a 'child,'" noting her ability to live independently and to direct her own care.

19

As between Alice and Joann, they were both Jamie's employees, but nothing in that relationship placed a duty on Alice to investigate or supervise Joann's provision of transportation to Jamie.

Even when there's no special relationship, a duty still can arise to a third party if the actor takes some affirmative step to render aid or services and is negligent in doing so. See *McGee v. Chalfant*, 248 Kan. 434, 440, 806 P.2d 980 (1991). But the plaintiff must show not only that the actor took such steps but also that the actor by some affirmative action assumed the obligation or intended to render aid or services to the other person. See *Honeycutt v. City of Wichita*, 251 Kan. 451, 464, 836 P.2d 1128 (1992). The scope of the duty is limited to the extent of the undertaking that was affirmatively assumed. *McGee*, 248 Kan. at 442.

On this point, in the district court, the plaintiffs argued that Alice had rendered aid to Jamie—even gratuitously—in the past. From that, the plaintiffs argued that she had some all-encompassing duty to protect Jamie on the day of the accident. But Alice did not have a duty to protect Jamie from all risks, and there's no evidence that Alice assumed any extra duty to protect Jamie on the day of the accident. Further, as the district court noted, there was no evidence showing that the probability of harm to Jamie from riding while Joann drove was reasonably foreseeable that day. See *South v. McCarter*, 280 Kan. 85, 103-04, 119 P.3d 1 (2005). Alice wasn't present when Dennis told Joann she ought to have Alice drive; Alice didn't know of any prior blackouts for Joann; and Alice didn't see anything that morning that caused her to question Joann's ability to drive them all home.

The plaintiffs suggested in the district court that since Joann was older and a diabetic, Alice's concern should have been heightened. But passengers don't have a duty to protect other passengers just because a driver is older or a diabetic. The probability of harm in such cases is not so reasonably foreseeable that a duty or liability would be imposed.

20

We wish to conclude our opinion by moving back to the bigger picture that frames this lawsuit. The fatality accident that led to the lawsuit was tragic, and we certainly sympathize with the loss suffered by Jamie's family. We do not mean in any way to minimize that loss through what may seem an antiseptic analysis of the legal claims at issue. But our job is to consider the claims in fairness to all parties under established legal principles. We have found no error in the district court's rulings challenged in this appeal. The district court's judgment is therefore affirmed.